**MOTOR TERMINALS, Inc. v. NATIONAL CAR CO. et al.**

**Civ. A. No. 1094.**

United States District Court
D. Delaware.

Dec. 12, 1949.

Richard F. Corroon, Wilmington, Del. (Southerland, Berl & Potter, Wilmington, Del.), and R. Randolph Hicks, of New York City, for plaintiff.

James R. Morford, Wilmington, Del. (Marvel & Morford, Wilmington, Del.), and Carl H. Richmond, of Washington, D. C., for defendants.

RODNEY, District Judge.

Plaintiff is an Ohio corporation, and both defendants are Delaware corporations. The amount in controversy is alleged in the complaint to exceed $3,000 in value. Both the plaintiff, Motor Terminals, Incorporated, and the defendant, National Car Company, have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A. In addition National Car Company has moved to dismiss the complaint under Rule 12 of the Federal Rules of Civil Procedure, upon a variety of grounds, including want of jurisdiction in this court and improper venue.

The facts of this case, although somewhat voluminously presented, do not result, as is agreed by the parties, in any substantial issue of fact. On February 13, 1940, Motor Terminals made a contract with National Car Company and Fruit Growers Express Company, of which National Car is or was a subsidiary, in which it was agreed that a new corporation, to be known as National Fitch Company, would be organized with a view to the exploitation of certain patents covering devices designed for coordinated railroad and truck use, referred to in the contract as the Fitch patents. Motor Terminals and the Car Company were to hold an equal number of the shares of the new corporation. This contract contained many other provisions

which are not now relevant, inasmuch as they were substantially incorporated in a further contract of March 1, 1940, which was entered into by Motor Terminals, the Car Company, and the newly organized National Fitch Corporation. The latter agreement is divided into three parts.

Part I of the agreement carries out the provisions of the earlier agreement, in so far as it provides for the transfer of half of the issued shares of National Fitch to the Car Company, while the other half is retained by Motor Terminals, and for the transfer by Motor Terminals to National Fitch of all its present and future patents relating to the business of coordinating rail and truck transportation.

Part II of the agreement defines the rights and obligations of the Car Company and National Fitch. Essentially it provides that National Fitch grants to the Car Company an exclusive right (except as to an installation at Cincinnati, Ohio) to make, use and vend the inventions under the assigned patents, for their full term; that National Fitch shall be "the perpetual, exclusive sales organization for negotiating contracts with shippers, receivers, railroads and others for their use of cars, tanks, other containers, and car and truck fixtures and appliances and cranes and other interchange devices, which contracts for the use of all the foregoing except truck fixtures and appliances and cranes and other interchange devices shall be in the name of National Car Company and subject to its prior approval (which approval shall not be unreasonably withheld) ;" that the contracts in the name of the Car Company shall secure to it the right to collect car mileage and other charges from railroads and shall provide that user-contractors will pay to the Car Company for the use of equipment and for services agreed amounts per day to be determined by the Car Company and National Fitch and to be payable to the Car Company monthly; that National Car shall at its own cost build, buy, lease, or otherwise acquire the use of such railroad cars, tanks, and other appliances, as distinguished from interchange devices, as may be required to fulfill the contracts made in its name and approved by it; that it will likewise build interchange devices necessary in the coordinated use of railroad and trucks, which latter devices National Fitch shall buy or lease from the Car Company at cost, so that National Fitch may sell or lease them in its own name to shippers, etc., on terms to be agreed on between National Fitch and the Car Company. Paragraph 7 of this part of the contract is the one most directly involved in this case. It provides as follows: "In full payment for all services of National Fitch Corporation hereunder, National Car Company shall pay to National Fitch Corporation said Car Company's collections from railroads for mileage and the like, and also its collections from the user-contractors as above provided, after deducting from the total of said collections (with respect to each of said user contracts severally) for itself its cost of ownership and of supplying cars, tanks and other containers and appliances supplied hereunder, which said costs shall include, as they may respectively apply, expense of maintenance, accounting, car operation, insurance, taxes (other than income taxes), rental, depreciation on cost of cars and car equipment at 4% per annum and on tanks and containers at 7% per annum (except that other rates of depreciation may hereafter be mutually agreed upon by National Car Company and National Fitch Corporation) and interest at 6% on the cost to National Car Company of said cars, tanks and other containers and appliances, provided, however, that such cost of cars, tanks and other containers and appliances shall not include any costs arising out of or attributable to defective workmanship or materials. The cost of equipment which is idle through no fault of the National Car Company or of National Fitch Corporation will be borne equally by said companies for such period of idleness. Standby equipment shall not exceed 5% of the amount of equipment in active service, and shall not be deemed idle through the fault of either party."

Part II of the agreement also provides that the Car Company shall keep the books and records, including those of National Fitch. It contains in addition an arbitration clause (paragraph 10) which requires

the Car Company and National Fitch to submit differences between them to arbitration.

Part III of the agreement provides, inter alia, that in the event of default by the Car Company, such default having continued for more than 30 days after written notice given the Car Company by Motor Terminals, all right, title and interest in the assigned patents shall revert to Motor Terminals.

The undisputed facts, as revealed by the pleadings and affidavits attached to the motions for summary judgment, show that, superficially at least, there has never been any substantial dispute between National Fitch and the Car Company regarding the construction and operation of the contract of March 1, 1940. National Fitch proceeded to obtain contracts with shippers which, in so far as they concerned the use of tanks, cars and similar equipment, were executed in the name of the Car Company, and the Car Company built or acquired the tanks, cars, interchange devices which were needed for the railroad-truck co-ordination business that thus came into being. The interchange devices were sold to National Fitch by the Car Company at cost. It is also shown that the rates charged by the Car Company under these contracts were arrived at by agreement between it and National Fitch, and that they were based substantially on suggestions made originally by Mr. Fitch, the then president of Motor Terminals. Such rates included among the elements incorporated in them, the items specifically set out in the contract of March 1, 1940, including interest and depreciation on the original cost of the cars, tanks, etc., built by the Car Company, and used in this business. These items and others mentioned in the agreement were subsequently deducted by the Car Company from its collections from the shipper-users and the balance remitted from time to time to National Fitch.

Such had been the uniform practice under this contract, at least up to the time of the institution of this suit. It appears that dissatisfaction with the operation of the contract, in so far as it affected the sums of money paid over by the Car Company to National Fitch out of collections from shipper-users, was first clearly expressed at a meeting of the board of directors of Motor Terminals in November, 1946. In March, 1947, it was moved at a meeting of the board of directors of National Fitch by one of the directors acting in the interest of Motor Terminals that the board adopt a resolution demanding that the Car Company submit to arbitration the disagreement between it and Motor Terminals regarding the proper interpretation of paragraph 7 of Part II of the contract. The resolution failed of adoption by a tie vote of the directors of National Fitch. Subsequently, negotiations took place between representatives of Motor Terminals and the Car Company looking to an amendment or clarification (as the plaintiff would prefer to designate it) of the contract, and more particularly to a cessation or modification of the practice of the Car Company's withholding from the sums remitted by it to National Fitch the items of interest and depreciation mentioned in paragraph 7 of Part II of the contract. The negotiations came to nothing, and this suit was then instituted by plaintiff, in which suit the plaintiff contends that the Car Company has improperly withheld items of interest and depreciation from its remittances to National Fitch because of its erroneous interpretation of paragraph 7 of the contract of March 1, 1940. A declaratory judgment interpreting paragraph 7 and damages are sought.

Before this case can be decided on its merits, there are some preliminary questions which require consideration. The defendant, National Car Company, objects on the ground that this court is without jurisdiction because of a lack of the necessary diversity of citizenship and because the amount in controversy is not sufficient. It has also asserted the defense of improper venue. These preliminary questions are themselves somewhat complicated by the fact that it is not clear in what capacity the plaintiff brings this suit. The form of the complaint, more particularly the allegation of no-collusion, suggests that this is a derivative stockholder's action. The plaintiff asserts, however, that in

bringing this suit it is also acting in its own right, that is, as a party to the contract of March 1, 1940, and that it is asserting a primary and a secondary right at the same time. Although this apparent dual nature of the action tends to make for some obscurity and complication of the issues, I do not feel that it is necessary to decide whether the plaintiff may properly maintain the action in two different capacities, for the reason that my conclusions with respect to the substantial points at issue would be the same regardless of the determination of this question, and for the further reason that it is not my understanding that defendant, National Car Company, has specifically and formally raised any defense of any improper dual nature of the action.

### Jurisdiction

If this action be regarded as one brought by the plaintiff in its own right, as a party to the contract of March 1, 1940, there can be no serious question that the necessary diversity of citizenship is present. That it is, is self-evident.

■ Again, if the action be considered as brought by Motor Terminals in its own right, somewhat more difficult questions are presented by the contentions that the complaint does not set out a claim upon which relief can be granted and that there is no showing that the necessary jurisdictional amount is in controversy. Motor Terminals is not directly affected by the provisions of paragraph 7 of Part II of the contract or any other provision of that integral part of the contract. Motor Terminals was a party to the contract but its sole and individual right arises in Part III which provides that in the event of default by the Car Company the Fitch patents shall become revested in Motor Terminals if such default continues for more than thirty days after the giving of written notice by Motor Terminals to the Car Company. There is no suggestion that the action of the Car Company in making the deductions in question is to be or could be considered such a default as would constitute an entire abrogation of the contract and result in the revesting of the patents

in Motor Terminals. No such object is disclosed by the complaint. No right is shown in Motor Terminals to have a general consideration of the terms of the contract which are effective and operative only on the Car Company and National Fitch Company. Since no right is shown to exist in Motor Terminals individually as is here sought, and no jurisdictional amount in such connection is established, I must conclude that the suit as brought by Motor Terminals in its individual capacity may not be maintained.

■ If this action be regarded as a derivative stockholder's action, it seems clear that there is the necessary diversity of citizenship to confer jurisdiction. Nor can there be any serious question with respect to venue. in the light of the decision of the Court of Appeals for this Circuit in Schoen v. Mountain Producers Corporation, 3 Cir., 170 F.2d 707, 5 A.L.R.2d 1226, certiorari denied 336 U.S. 937, 69 S.Ct. 746, 93 L.Ed. 1095. As to the amount in controversy, there can be no doubt that if the contentions advanced by the plaintiff on behalf of National Fitch are correct, the amount in controversy, as shown not only by the pleadings but by the affidavits, is far in excess of $3,000, exclusive of interest and costs.

### Declaratory Judgment Action

A further preliminary contention is made by the defendant, National Car Company, to the effect that this court may not entertain this declaratory judgment action because there is no "actual controversy;" because a cause of action may not be asserted derivatively by a stockholder; and because, under the Declaratory Judgment Act, 28 U.S.C.A. §§ 2201, 2202, the action would have to be brought by a party claiming some right by reason of adverse expressions or threats of impending litigation on the part of the defendant. It is insisted that no threats of impending litigation have been suggested as emanating from the National Car Company or other course of conduct other than a normal course pursuant to the contract and that a declaratory judgment action could only be brought by National Car Company and not against such company.

■ Taking up these arguments in reverse order, it seems clear under express language of Rule 57 that "the existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate." Regardless of holdings under state declaratory judgment statutes, there seems abundant authority under the federal act that the existence of another remedy does not debar remedy by declaratory judgment if such remedy is appropriate. See Borchard, Declaratory Judgments, 2d Ed., 315–346; Maryland Casualty Co. v. Consumers Finance Service, Inc., 3 Cir., 101 F.2d 514; Columbian National Life Ins. Co. v. Foulke, 8 Cir., 89 F.2d 261; Stephenson v. Equitable Life Assurance Soc., 4 Cir., 92 F.2d 406. In the Maryland Casualty Co. case it was expressly stated that the district court should not exercise its discretion in the sense of declining to entertain a declaratory judgment suit merely because an alternative remedy is available to the plaintiff.

■ Defendants' contention that a cause of action under the Declaratory Judgment Act may not be asserted derivatively by a stockholder appears to be based principally on the fact that there appears to be little or no precedent or authority specifically sustaining the right of a stockholder to sue derivatively for a declaratory judgment. There seems to me to be no good reason why a stockholder may not, in a proper case, seek a declaratory judgment in a derivative action at, least when the suit is concerned, as it is here, with past acts which have allegedly injured the corporation, in the right of which the stockholder sues, and there is coupled with the prayer for declaratory relief a general prayer for coercive relief, in this case the payment to the allegedly injured corporation of sums of money heretofore withheld from it by the real defendant. Neither plaintiff nor defendant has cited any authority either supporting or contravening the proposition that a declaratory judgment action of this nature may be maintained. An independent search has failed to disclose any precedent directly in point. However, it is of interest to note that in Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688, the plaintiffs, stockholders bringing a derivative action, sought, in addition to other relief, a declaratory decree with respect to the rights of the Authority in various relations.

■■ A proceeding in the nature of declaratory judgment is a form of remedial procedure which is particularly appropriate where the basic issue underlying the claim of the plaintiff is the interpretation or construction of a contract. Indeed, it is said in Lehigh Coal & Navigation Co. v. Central Ry. of New Jersey, D.C., 33 F.Supp. 362, 365, "Construction and interpretation of written instruments (including contracts, insurance policies, statutes, ordinances, wills, and trusts) is the principle (sic) function of a declaratory judgment proceeding." I see no reason why stockholders acting in a derivative character and complaining of the action of the directors of the corporation of which they are a part in connection with a written contract may not utilize declaratory judgment proceedings in construing such contract.

■ It is true that in an ordinary derivative suit by a stockholder seeking redress to a corporation concerning rights growing out of a written contract where the directors wrongly refused to take action, the interpretation of such written contract would be considered without regard to the declaratory judgment statute, and such statute would not be necessary for such interpretation. Cases could and do exist, however, when damages in such derivative suits might not be sought, but merely a declaration of rights *in futuro* under the contract, and in such derivative cases it would seem that declaratory judgment procedure could be availed of. This is especially clear since, under the Act, the procedure could be adopted "whether or not further relief is or could be prayed." This language, in the judgment of the advisory committee, indicates that declaratory relief is cumulative and not exclusive or extraordinary.

■■ Defendant also argues that there is no "actual controversy" between National Fitch and the Car Company. In

a purely superficial sense this may be true. However, this would also be true, I believe, in the same sense, of any stockholder's derivative action, for the obvious reason that the occasion for such a suit arises only when the directors of the injured corporation have improperly failed to assert its rights against other parties. One of the purposes of a derivative stockholder's action is to enable a stockholder to bring into court a controversy, the existence of which may have previously been denied by the directors of the corporation. I am satisfied that in this case an "actual controversy" exists.

### Demand on Directors of the Corporation

■ There are two further contentions of the defendants which require perhaps some brief notice. One is that there is no showing of sufficient prior demand on the directors of National Fitch to entitle the plaintiff to bring a derivative stockholder's action. It is true that the demand which was made had for its objective the institution of arbitration proceedings and did not seek precisely the same relief as is sought now. However, there can be little doubt that the board of directors of National Fitch was sufficiently apprised in a general sense of the complaint and contentions of the plaintiff, and that, after it declined to seek arbitration as demanded by the plaintiff, plaintiff was excused from making any further attempts, which would plainly have been futile, to induce the board of directors of National Fitch to assert the rights which in the view of the plaintiff it had. There can be no question that a demand on the directors is excused where it would be futile. Fleer v. Frank H. Fleer Corporation, 14 Del.Ch. 277, 125 A. 411; 13 Fletcher Cyc. Corp., Perm.Ed., Sec. 5965. Where, as in this case, the taking of the demanded action by the board of directors is prevented by a tie vote, the board being evenly divided between directors representing the only two stockholders of the corporation, the bringing of a stockholder's action would seem to be the appropriate remedy for the disappointed stockholder. See Sterling Industries, Inc. v. Ball Bearing Pen Corp., 1949, 298 N.Y. 483, 84 N.E.2d 790, 10 A.L.R.2d 694.

■ It has also been suggested that plaintiff's only remedy, at least as regards its right to sue derivatively, is to compel the defendants to submit the matter in controversy to arbitration. Under the law of Delaware, however, it seems that an agreement to arbitrate cannot generally be pleaded in bar of an action. Electrical Research Products, Inc. v. Vitaphone Corp., 20 Del.Ch. 417, 171 A. 738. In addition, it has been held that federal courts will not give effect to an arbitration clause to the extent of refusing to take jurisdiction where arbitration has not been instituted. See Hunkin-Conkey Const. Co. v. Pennsylvania Turnpike Commission, D.C., 34 F.Supp. 26. In the light of these authorities, therefore, I conclude that the existence of the arbitration clause does not in any way bar the bringing of this action.

### The Merits

I come now to a consideration of the merits of the case. Plaintiff contends that the Car Company has been improperly withholding certain sums of money from National Fitch, such sums representing interest and depreciation on cars, tanks and other equipment which has been built by the Car Company and leased to shipper-users, pursuant to the contract of March 1, 1940. As I understand it, plaintiff's argument may be summarized as follows:

(1) The Car Company has retained title to these cars, tanks, etc., and therefore has no right to "charge" interest and depreciation on them to National Fitch.

(2) Alternatively, if interest on the cost of this equipment is "charged" to National Fitch, it was clearly the intention of the parties that the title to the equipment should vest in National Fitch.

(3) Interest on the cost of the equipment should have been charged once only, or alternatively should be charged on the depreciated value of the equipment.

(4) Depreciation at the rates specified in the contract should be charged only on the depreciated value of the equipment.

■ I do not feel that any extended discussion of these contentions is necessary.

A reading of paragraph 7 of Part II of the contract of March 1, 1940 shows clearly that it was agreed that the Car Company should pay to National Fitch its collections from railroads and user-contractors, "after deducting from the total of said collections * * * for itself its cost of ownership and of supplying cars * * * which said costs shall include, as they may respectively apply, expense of maintenance, accounting, car operation, insurances, taxes, * * * rental, depreciation on cost of cars and car equipment at 4% per annum and on tanks and containers at 7% per annum * * * and interest at 6% on the cost to National Car Company of said cars, tanks, * * *." It is clear from the contract as a whole that the cars, tanks and containers to be used in this coordinated railroad-truck business were to be built or otherwise acquired by the Car Company and that the Car Company should remain the owner of them. A different arrangement was made with respect to interchange devices, but that is not relevant here. It seems clear from the contract and affidavits that it was agreed that the Car Company should include the interest and depreciation charges on the cars and tanks in the rates charged to the railroads and shippers and subsequently, upon settlement with National Fitch, should withhold these amounts of interest and depreciation. It seems reasonably clear that this right was given to the Car Company because of its investment in this equipment which was thus made available for the production of funds to be paid to National Fitch. The pleadings and affidavits show that it has been the practice of the Car Company, acquiesced in by National Fitch, to compute the amount withheld for interest and depreciation on the cost value of equipment actually available for use, and that when a particular car or tank was permanently withdrawn from service the original cost of that item was eliminated in computing the depreciation and interest to be withheld from amounts remitted to National Fitch. The contract specifically provides that depreciation shall be at certain rates based on the cost of the equipment, which plainly means the original cost of the equip-

ment. It is true that it is not specifically stated that interest shall be payable annually, but in the absence of a provision to the contrary or unless the context clearly shows that such was not intended, the law infers that interest shall be payable annually. Durant v. Murdock, 3 App.D.C. 114.

Plaintiff points to certain phrases and expressions in this paragraph of the contract which, it contends, show that the Car Company has no right to withhold from its collections sums representing annual interest and depreciation at the specified rates. Without going into these in detail, I can only say that in my opinion these contentions seem without merit. Furthermore, if I had any doubt regarding the lack of ambiguity in the contract—and I should add that I have none—any such doubt would be removed by the established fact that no complaint of the withholding of these items was made until the contract had been in existence and operation for six years or more. See Cinema Patents Co. v. Craft Film Laboratories, 3 Cir., 64 F.2d 42.

An examination of the pertinent contract does not disclose any uncertain or ambiguous phrase or meaning. In such case, of course, there is no room for construction or interpretation. As said in Laird v. Employers' Liability Assur. Corp., 2 Terry 216, 41 Del. 216, 18 A.2d 861, "Where there is no ambiguity in the language of the contract it is beyond the reach of rules of construction; and the courts cannot change or ignore the language of a contract merely to avoid hardships or to meet special circumstances against which the parties have not protected themselves."

My conclusion, therefore, is that the real basis of the plaintiff's claim is not an interpretation or construction of the contract but the establishment of a new contract by the court, and this I am not able to accomplish. I therefore must conclude that judgment must be entered, under Rule 56 of the Federal Rules of Civil Procedure, for the defendants. An appropriate order may be submitted.