Paul JONES, Receiver, Pepsi-Cola Bottling Company of Alliance, Nebraska, Plaintiff,

v.

PEPSI-COLA COMPANY, a corporation, Defendant.

Civ. No. 592L.

United States District Court
D. Nebraska.

Nov. 6, 1963.

652

Robert R. Moran, Alliance, Neb., for plaintiff.

Phillip M. Aitken, Lincoln, Neb., for defendant.

VAN PELT, District Judge.

This is an action for equitable relief in the form of an injunction and further for a declaratory judgment under Title 28 U.S.C.A. § 2201. Relief in the form of a declaratory judgment is proper in an action of this type. See Motor Terminals v. National Car Co., 92 F.Supp. 155 (United States District Court for the District of Delaware), affirmed 182 F.2d 732, where the court said:

"A proceeding in the nature of declaratory judgment is a form of remedial procedure which is particularly appropriate where the basic issue underlying the claim of the plaintiff is the interpretation or construction of a contract." 92 F. Supp. at 161.

Under the doctrine of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, the substantive law of Nebraska is applicable. The court believes the decisions from other jurisdictions hereinafter referred to would be followed by the Nebraska Supreme Court.

The action involves two contracts designated "Exclusive Bottling Appointment" and "Exclusive Fountain Syrup·

Appointment", both between the Pepsi-Cola Company and the Pepsi-Cola Bottling Company of Alliance, a partnership consisting of Edward J. Essay and his mother, Martha Essay. Both contracts are dated March 17, 1948. The partnership was dissolved by decree of the District Court of Box Butte County, Nebraska, on July 24, 1961, and a receiver appointed for the purpose of winding up the business of the partnership. For reasons to be hereinafter explained, the Bottling Appointment is of primary concern to the court.

To reach a decision as to the rights of the parties under the contracts in question, it is essential to determine what type of contracts were executed. Pepsi-Cola Company owns the registered trade name and trademark "Pepsi-Cola" and manufactures the "secret syrup" used in the bottling of the soft drink "Pepsi-Cola".

The bottling agreement provides that the bottler will closely follow the instructions of the Pepsi-Cola Company in relation to the bottling of the product, will operate a clean bottling plant at Alliance, Nebraska, to serve 21 counties in Nebraska and one county in South Dakota, will not handle a beverage that could be confused with Pepsi-Cola, and sets forth how the "secret syrup" is to be mixed and bottled. It further provides that the bottler will vigorously push the sale of Pepsi in his territory and will purchase the necessary syrup for the mixing of the finished product. The agreement has a forfeiture clause in the event that the bottler discontinues bottling the product for 30 days. Clause 14 of the "Appointment" provides as follows:

"That this Appointment cannot be transferred by the Bottler to another Bottler in said territory unless the Bottler first secures the prior written approval of Pepsi-Cola and the assignee assumes in writing the duties and obligations herein contained."

■ Trademarks, and particularly their use, are commonly transferred either by license or by assignment. The distinction between the two methods is of vital importance to the case at bar. An assignment passes the entire interest of the assignor in the trademark to the assignee, while a license to use the mark does not pass title to the trademark. The licensor retains all interest in the trademark other than that transferred to the licensee by the license agreement. See The Coca-Cola Bottling Co. v. The Coca-Cola Co., 269 F. 796 (District Court, District of Delaware) for a discussion of an assignment and E. F. Pritchard Co. v. Consumers Brewing Co., 6 Cir., 136 F.2d 512, explaining a license of a trademark. Doud v. Hodge, 146 F. Supp. 887 (United States District Court for the Northern District of Illinois) affirmed 354 U.S. 457, 77 S.Ct. 1344, 1 L. Ed.2d 1485, upheld the validity of a license agreement other than as an incident of a transfer of a business so long as it provided supervisory control of the product or services.

■ In determining the nature of the transfer in the case at bar, the contract executed will be compared with the contracts in both an assignment and a license agreement of similar trademarks. In the Coca-Cola Bottling Co. case, supra, 269 F. at page 811, the transfer of the trademark was held by the court to be an assignment or " * * * an absolute and unlimited right of user in the complainant to the exclusion of all others, including the Georgia corporation, its successors and assigns, [the assignor of the trademark] in the territory in question." The agreement itself provided for the establishment of a bottling plant by the bottler, that the bottler was to prepare the finished product, a 90-day forfeiture clause in the event of failure to produce the finished product in sufficient quantities, and a clause "granting" sole and exclusive use of the name and trademarks in the described territory. Of major importance was the fact that the territory involved the entire United States except for some eight states. The court held that the value of the assets, some $20,000,000.00, es-

tablished as a result of the contract, was relevant to show that the contract was not subject to the will of any one party. It further held that the contract was in reality the purchase and sale of a potential business and the right to establish an actual business with property rights passing therewith. The agreement for the purchase and sale of syrup was held to be not of more importance than the other provisions relative to the use of the trademark and the entire agreement was held to be perpetual.

A contract such as the one in The Coca-Cola Bottling Co. case, supra, is to be compared with the contract in Ard Dr. Pepper Bottling Co. v. Dr. Pepper Co., 5 Cir., 202 F.2d 372, which was held to be a license agreement. The case involved the cancellation for cause by the Dr. Pepper Co. of its contract with the bottler. The contract provided for the price and terms of sale of the syrup, that the bottler would accept Dr. Pepper as its leading drink, that it would use approved equipment, that the bottler would promote the business and allow inspection. It further provided for advertisement, the maintenance of the plant, that the agreement would not be assigned, and contained a provision allowing cancellation upon 90 days notice by the bottler and for cause by Dr. Pepper Co. The court held such an agreement to be a license agreement and properly terminated for cause.

Similarly, in Brosious v. Pepsi-Cola Co., 3 Cir., 155 F.2d 99, the court indicated that a contract much similar to the one involved in the case at bar was a license agreement. The contract provided for the exclusive distributing of the product, that the bottler would push vigorously the sale of the product, and a provision made the contract assignable upon the approval of the parties. The court said, 155 F.2d on page 101:

"It is not asserted that Pepsi-Cola is without the unqualified right to make a contract whereby it sells its product to be distributed under reasonable conditions calculated to protect the good reputation of its product which is sold under a trade-marked name."

The contract involved in the case at bar concerns but a few counties in Western Nebraska and South Dakota as compared with the greater part of the United States in The Coca-Cola Bottling Co. case, supra. Furthermore, while the amount involved is substantial, some $240,000.00 according to testimony in the record, it does not approach the $20,000,000.00 involved in the Coca-Cola case. The Pepsi-Cola Company has retained rights to terminate the contract for cause in the event the bottling company did not operate a clean plant or properly bottle the product. Upon considering these elements in the contract before the court, the court concludes that the contract was a license agreement between the parties for the use of the trademark "Pepsi-Cola" in territory set forth therein.

■■ The court concludes that this license agreement was of perpetual duration. It is first to be noted that parties may contract in respect to trademarks, subject only to the law of corporations, with the law of contracts generally applying to these agreements. See Huber Baking Co. v. Stroehmann Bros. Co., 2 Cir., 252 F.2d 945 and Maola Ice Cream Co. v. Maola Milk & Ice Cream Co., 238 N.C. 317, 77 S.E.2d 910. The court reaches the conclusion that the contracts were perpetual upon consideration of the facts that the Pepsi-Cola Bottling Company of Alliance made substantial investments in bottles and equipment indicating that the parties did not intend for the contract to be subject to the whim of one party and that within the contract itself there was no length of time specified for the contract to be in effect.

A similar contract for the bottling of Coca-Cola was held to be perpetual in E. L. Husting Co. v. Coca Cola Co., 205 Wis. 356, 237 N.W. 85, 238 N.W. 626, 84 A. L.R. 22, in which an attempt was made by the supplier of syrup to cancel a contract with the bottler. The contract involved therein contained many provisions similar to the contract in question. It

also had no fixed term but was indefinite in duration. The court held that if the contract were to be terminated it would be impossible for the bottler to replace himself in the market because of the " * * * character of the product and the manner of its vending * * *." Thus the court granted an injunction against the " * * * breach of the expressed or implied negative covenant which is always present in this type of contract." Citations omitted. The injunction prohibited the supplier, Western Bottling Co., from supplying syrup to any other bottler in the territory. Mere money damages were held to be inadequate to compensate the plaintiff bottler for breach of the contract.

See also Tanner-Brice Co. v. Sims, 174 Ga. 13, 161 S.E. 819, in which the Supreme Court of Georgia held that while a license when given without consideration is terminable at the will of the licensor, such license becomes irrevocable when given for valuable consideration or preceded by the expenditure of money.

 While the contracts are perpetual, they could be terminated for cause or under the forfeiture clauses present in the contracts. However, from the evidence presented to the court it does not appear that the bottler has committed any act that could be considered cause for termination under either contract nor has the activity at the plant ceased so as to make the forfeiture clauses applicable.

The court will make no determination as to the personal nature of the contract, nor as to the applicability of the general rule prohibiting the assignment of contracts imposing personal obligations or involving personal trust and confidence. The parties chose to include within the contracts involved clauses controlling the problem of assignability, and these clauses will control. See D. L. Stern Agency v. Mutual Benefit Health & Acc. Ass'n, 43 F.Supp. 167, (District Court for the Southern District of New York) in which the court said, (43 F.Supp. at p. 169) "A provision in the contract expressly permitting an assignment is competent to make effective the subsequent transfer." Involved in the Stern case was a contract providing for the establishment of the plaintiff as general agent for the defendant in the insurance business to "operate in the New York area in the promotion of the defendant's business."

In Vol. 3, Williston on Contracts, 3rd Edition, § 423, is found the following discussion:

"Rights which would not otherwise be capable of assignment because too personal in their character, and duties, the performance of which for a similar reason could not be delegated, *may be assigned or delegated if the contract so provides.* * * *" (emphasis added) (141)

The court concludes that the specific provisions placed in the contracts by the parties must control their assignability at this time.

 There is little dispute that the "Exclusive Fountain Syrup Appointment" is not assignable without the assent and approval of the Pepsi-Cola Company. Clause 13 of the Appointment provides:

"That this Appointment cannot be transferred by the Bottler without the prior written approval of the Company and then only subject to such further conditions, if any, as the Company may wish to impose. No sub-authorization of any sort may be given hereunder by the Bottler."

Such expression of the parties' intent is clear and unambiguous. The fountain syrup agreement cannot be assigned without the assent of the Pepsi-Cola Company.

The language quoted from the fountain syrup appointment and the language of the bottling appointment relating to assignment is, as hereafter appears, different. The fact that the third page of the two agreements both appear to have been drafted in October of 1946 and yet are worded differently must have

some significance as is hereafter discussed.

The first bottling appointment dated June 28, 1937 is in evidence as defendant's Exhibit 29. It provides:

"15. That this appointment may be transferred by the Bottler to another Bottler in said territory, who shall assume, in writing, the duties and obligations herein contained, provided, however, that the Bottler secures the prior written approval of Pepsi-Cola."

It is clear that this appointment is transferrable to another bottler provided the prior approval of the defendant is obtained.

The next appointment is dated March 8, 1940, and is in evidence as Exhibit 30. The assignment clause reads:

"14. That this appointment cannot be transferred by the Bottler to another Bottler in said territory unless the Bottler first secures the prior written approval of Pepsi-Cola and the assignee assumes in writing the duties and obligations herein contained."

There are three subsequent bottling appointments, to-wit, Exhibit 32, dated July 31, 1945, Exhibit 36, dated December 11, 1947 and Exhibit 1, the agreement in suit, dated March 17, 1948. Paragraph 14 of each of these three agreements is identical with paragraph 14 of Exhibit 30.

Comparing these last four appointments with the first appointment it is evident that the language is changed from an affirmative to a limited negative. The first agreement affirmatively provided that the appointment "may be transferred * * * to another Bottler." The subsequent appointments cannot be transferred "to another Bottler in said territory," unless the two things outlined are secured or done. All relate to writings.

In none of the five appointments is there an absolute prohibition against transfer. The only prohibition against transfer is as above quoted. On the other hand the language of the syrup appointment, when it is remembered that it was drafted by counsel for the same company and during the same month, is instructive. It specifically says: "That this appointment cannot be transferred by the Bottler without the prior written approval of the Company and then only subject to such further conditions, if any, as the Company may wish to impose." The inclusion of this language in one and its omission in the other must have some meaning. The court concludes that the two contracts are separate and distinct; that one is not assignable without the consent of the defendant and the other is assignable without defendant's consent except to a "Bottler in said territory."

While the Nebraska rule pertaining to the construction of contracts requires instruments executed by the same parties, at the same time, for the same purpose, to be construed together, it does not permit two instruments to be construed together when they concern separate or entirely different subjects. See Gerdes v. Omaha Home for Boys, 166 Neb. 574 at 585, 89 N.W.2d 849.

In the case at bar the two contracts refer to different things. One provides for the distribution of fountain syrup. The other has as its subject matter the bottling and sale of Pepsi-Cola. However, even if they were to be construed together, to do so would only serve to establish the difference in the provisions dealing with the assignability of the two contracts. It is conceivable that the provisions for the two contracts would be different. The expense involved in establishing a bottling plant for soft drinks is much greater than the expense of distributing a fountain syrup due to the difference in equipment and personnel needed to perform a bottling operation as opposed to the distribution of syrup.

Applicable here is the rule long and well established, to-wit, *"Expressio unius est exclusio alterius."* That this rule is a familiar one in Nebraska, see

Hafeman v. Gem Oil Co., 163 Neb. 438, 80 N.W.2d 139. The case that is particularly instructive in its application of the rule is that of Southern Coast Corp. v. Sinclair Refining Co., 5 Cir., 181 F.2d 960, 961, 962, from which we quote:

"In order to determine the intention of the parties with respect to their rights under the contract, we must consider the language contained in the following paragraphs of the contract:

"'It is agreed that you shall have the option to purchase gas for the years from 1946 through 1951, inclusive, at the rate of 5½¢ per cubic thousand feet of gas, provided same is exercised in writing on or before ninety (90) days from the end of this contract period.

"'It is further agreed that Southern Coast Corporation shall have the preferred and preferential right in the event you do not exercise such option to meet any price for gas quoted to you by a reputable, responsible, and then existing gas pipe line distributing company, and before purchasing gas from any such competitor you shall first obtain the refusal in writing from Southern Coast Corporation declining to meet such competitive price as offered.'

"The option confers on the appellee the right to buy gas from the appellant from 1946 through 1951 at the rate of 5½¢ per one thousand cubic feet provided the option is properly exercised within 90 days before the end of the contract period. No right is conferred on the appellant to require appellee to purchase gas from it during this period. The only right conferred on the appellant is the right to meet any price quoted appellee by a reputable, responsible, and then existing, gas pipe line distributing company. By expressly limiting the class of suppliers from which appellee could not purchase gas without obtaining appellant's refusal, appellant is deemed to have excluded all others. The doctrine of *expressio unius est exclusio alterius* applies. The expression in a contract of one or more things of a class implies the exclusion of all not expressed, even though all would have been implied had none been expressed. By the plain and simple terms of the contract, appellee was permitted, after January 1, 1946, at its option to obtain gas from any source it might choose, other than from a reputable, responsible, and then existing, gas pipe line distributing company, without obtaining appellant's refusal. * * * "

This case, although it involves a pipe line contract, is particularly applicable here. The court concluded that the words "a reputable, responsible, and then existing, gas pipe line distributing company" having been set forth, that the appellant having so limited the class of suppliers from whom appellee could not purchase gas without obtaining appellant's refusal, had excluded all others. Similarly here, if defendant had not included the class of bottlers, a restriction on transfer would have been effective as to all assignees. Having included the words "to another Bottler in said territory" it thereby excluded all assignees other than bottlers.

In examining the 14th clause of the bottling appointment it is important to keep certain principles in mind applicable to the interpretation of contracts. A written contract, when couched in clear and unambiguous language, is not subject to construction and the intent of the parties is deduced from the language in the contract. Hompes v. B. F. Goodrich Co., 137 Neb. 84, 288 N.W. 367. Parties to a contract are bound by the terms thereof even though their intention may be different from that expressed by the agreement. Jenkins v. King, 224 Ind. 164, 65 N.E.2d 121, 163 A.L.R. 397.

Williston, in Vol. 4, Williston on Contracts, 3rd Edition, § 609, points out that words cannot be considered without an

association between the words and external objects. On page 409 he goes on saying,

> "* * * and no matter how definite a contract may appear on its face, 'words must be translated into things and facts.' Thus, as recognized by the trial court, the contract in any event had to be appraised in view of the surrounding circumstances known to the parties at the time of its execution and these resonably could be looked to without violating the parol evidence rule even though the contract were not deemed ambiguous."

On page 414 he goes on to explain that there are times that terms in clear and unambiguous contracts must be given their special or local meaning as opposed to general meaning, if the parties so intended or such meaning would be the "ordinary meaning to parties of the kind who contracted at the time and place where the contract was made, and with such circumstances as surrounded its making."

However, this is limited by Williston in § 610, in that when the agreement between the parties is reduced to writing, the intent of the parties must be ascertained from the writing itself. On page 503 Williston states,

> "* * * though courts say they are seeking the intention of the parties, the assertion is even more emphatic that this intention can be found only in the expressions of the parties in the writing. In effect, therefore, it is not the real intent but the intent expressed or apparent in the writing which is sought."

There can be no doubt but that the contract in question, the bottling appointment, was intended to be the complete and integrated agreement between the parties, with no prior negotiations or agreements to be considered in interpreting the contract. Clause 15 of the contract states:

> "That this written Appointment of said Bottler expresses fully, the understanding, and that all prior understandings are hereby cancelled, and no future changes in the terms of this Appointment shall be valid, except when and if reduced to writing and signed by both the Bottler and Pepsi-Cola, by legally authorized officials."

The 14th clause of the bottling appointment provides that the appointment cannot be transferred to another bottler in the territory without the written approval of the Pepsi-Cola Company and the assumption by the assignee of the duties and obligations of the contract. Such language is clear and will not permit the admission of extrinsic evidence of the parties' intent to modify or change the meaning transmitted by its use.

Some of the earlier letters, and particularly Exhibit 40, cannot be used to add to the contract or vary or contradict its terms. The parol evidence rule forbids such. No attempt has been made during the trial to amend Exhibit 1 or Exhibit 36 to conform to Exhibit 40. The court doubts that such an attempt would be approved by any court since the two agreements made subsequent to the signing of Exhibit 40 were both drafted by the defendant.

There has been no evidence introduced that the parties gave anything other than the general meaning to the terms used in the clause, so that is the meaning that will be used by the court. There has been no showing that people in the bottling business import a trade meaning to the terms used, in particular the word "bottler".

It becomes apparent that the appointment may be transferred to someone other than "another bottler in the territory" without the consent of the company. The necessary implication of prohibiting the assignment to a bottler in the territory is that the appointment is assignable to someone other than such a bottler. It is important to note that in examining similar contracts dealing with the licensing of bottling trademarks, the court was unable to find a single instance

in which similar language was used to regulate the assignment of the rights arising under the contracts. Furthermore, the fountain syrup appointment contains a flat prohibition of assignment without approval of the Pepsi Company. It would have been a simple matter for the company to include such a prohibition within the contract in question had the company so desired. "Bottler" is considered to be one who bottles and it is reasonable to reach the conclusion that the company's intent at the time of the execution of the contract was to prevent the assignment of the contract to one engaged in the bottling of a competing product. The third clause of the contract dealing with products that the bottler may handle is not as far reaching as the prohibition against assigning to a bottler engaged in the bottling of any soft-drinks as clause 14 accomplishes.

The court concludes that since the bottling appointment is assignable, it did not terminate at the time the partnership was dissolved. It remains as an asset of the partnership, transferrable according to the terms of the contract, and will remain so until terminated for cause as its existence is perpetual. The court concludes that the fountain syrup appointment is not assignable without the assent of the Pepsi-Cola Company, but is also perpetual in existence. However, if the company chooses not to permit its assignment, it will end at the time the partnership is terminated and its affairs wound up.

The defendant argues that the plaintiff is estopped to deny that the appointments terminated with the dissolution of the partnership because the receiver and the partners knowingly acquiesced in the actions of the Pepsi-Cola Company in terminating the appointments and in accepting the benefits of the temporary appointments issued. While it is true that the company advised both the partners and the receiver that the appointments were being terminated, it does not appear from the evidence that the receiver signed and returned the authorizations as requested by the company so as to indicate his acquiescence. Actually, in a letter from the attorneys for Mrs. Essay dated October 5, 1961 to the Pepsi-Cola Company, Exhibit 43 herein, it is asserted that the original appointments were still in effect. However, the company continued to furnish the syrup until November 30, 1962, at which time it terminated business with the receiver. Exhibits 6 and 7, letters to Pepsi-Cola Company from Sudman, the first receiver, show that he did not accept the terms of the temporary appointment without court approval. This approval was apparently never forthcoming.

The court concludes that the necessary elements of estoppel are not present, that the defendant was in no way misled by the actions of the parties, and further that the defendant was or should have been aware that Martha Essay was claiming the appointments in effect during the partnership's existence remained in effect.

The plaintiff will be granted an injunction enforcing the implied negative covenant in the bottling appointment to refrain from furnishing the "secret syrup" to another party in the territory so as to enable such party to bottle "Pepsi-Cola" or granting the right to the use of the trade name Pepsi-Cola to another party in the territory. A similar injunction will be issued for the fountain syrup appointment for the duration of the receivership.

The plaintiff will be granted a declaratory judgment to the effect that the bottling and fountain syrup appointments are perpetual contracts and assets of the partnership, subject to the limitation as to assignment as discussed herein.

The defendant's cross-petition will be overruled and costs taxed herein to the defendant.

This opinion will stand as the court's findings of fact and conclusions of law. Counsel for plaintiff will draft an order and submit the same to counsel for defendant for approval as to form only. If counsel are unable to agree upon the

form of order to be entered, counsel for plaintiff will submit to the court the form of order proposed by him and counsel for defendant will likewise submit to the court in writing the objections thereto and the court will thereupon enter an order.