MARTHA ESSAY, APPELLEE, V. EDWARD J. ESSAY, APPELLANT, BUSINESS CAPITAL, INC., OF IOWA, INTERVENER-APPELLANT.
141 N. W. 2d 436

Filed April 1, 1966. No. 36030.

No appearance for appellant.

Reddish, Fiebig & Curtiss, Robert L. Jeffrey, and Richard L. Goos, for intervener-appellant.

Wright, Simmons & Hancock, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ.

BROWER, J.

This is the second appearance of this case in this court. Our prior decision is set forth in Essay v. Essay, 175 Neb. 689, 123 N. W. 2d 20. In that case a supplemental opinion was entered on rehearing at 175 Neb. 730, 123 N. W. 2d 648.

The action was originally brought by the plaintiff Martha Essay for the dissolution of the partnership existing between the plaintiff and the defendant Edward Essay, doing business as Pepsi-Cola Bottling Company and Standard Bottling Company, and for an accounting of its operations and the appointment of a receiver to wind up its affairs. The intervener Business Capital, Inc., of Iowa filed a petition in intervention subsequent to our first decision. Its interest arises by virtue of an assignment of the interest of the defendant in all of the partnership assets as collateral security for the loan of $60,000 made by it to the defendant Edward Essay.

The previous appeal to this court was from a judgment of the trial court entered September 7, 1962, which found the partnership was dissolved on April 13, 1960, by reason of the defendant on that day excluding the plaintiff from the partnership business. The trial court's judgment had approved an audit of the partnership accounts as of July 24, 1961, the day a receiver was appointed. It found the plaintiff's investment account in the partnership was $181,231.27 and that of the defendant was a minus $138,657.43. In addition to his overdraft, the defendant had converted to his own use $40,378.81 of the partnership funds which he had not shown on the books of the partnership. The trial court had entered judgment against defendant in favor of the plaintiff for one-half of the said overdraft in defendant's drawing account, one-half of the money so converted being $89,517.62, together with half of certain rentals due plaintiff amounting to $3,000. The receiver was directed to sell the partnership as a going concern and to make a distribution in a manner to be subsequently determined by the court. This court in its opinion in Essay v. Essay, 175 Neb. 689, 123 N. W. 2d 20, accepted the audit and the trial court's judgment with respect to the matters set forth above.

The trial court in its judgment had found that since the defendant's investment account was overdrawn and the plaintiff owned all of the capital assets, the plaintiff was entitled to all of the profits from the partnership from its dissolution to the receiver's appointment. In our first opinion, Essay v. Essay, 175 Neb. 689, 123 N. W. 2d 20, this portion of the trial court's judgment was reversed and it was there held that the profits from the dissolution, April 13, 1960, to the appointment of the receiver were to be shared equally by the parties. It was this portion of our decision that the supplemental opinion, Essay v. Essay, 175 Neb. 730, 123 N. W. 2d 648, changed. That opinion states: "We direct the trial court to reserve its ruling with reference thereto until

there has been a final accounting of the capital and assets of the partnership, and that the profits earned after the dissolution be then apportioned in the proportion that each had in the partnership assets at the time of dissolution, subject to a consideration of the service and personal skill of Edward Essay in earning such profits, either by adequate compensation therefor or by increasing his share of the profits as equity requires."

Two appeals are presently before this court. The first is from the judgment of the trial court determining the assets of the partnership and the interest of the partners therein on the date of dissolution, and the corresponding interest of the partners in the subsequent profits after dissolution. The second is from an order confirming the sale of the business to the plaintiff. Although both appeals were taken by both the defendant and intervener, the intervener alone has filed briefs herein. We will consider the two appeals in the order stated in this paragraph.

After the case was remanded to the trial court, the plaintiff and defendant on May 7, 1964, stipulated that the receiver retain the accounting firm of Crum, Miller & Melick and instruct it to prepare a balance sheet of the Pepsi-Cola Bottling Company and Standard Bottling Company at the close of business on April 13, 1960. Thereafter such a balance sheet was submitted by the accounting firm mentioned in the stipulation, showing the assets and liabilities of the Pepsi-Cola Bottling Company and the Standard Bottling Company as of that date, with a statement of operations from January 1, 1960, through April 13, 1960, and the capital accounts of the partners from January 1, 1956, through April 13, 1960.

On July 13 and 14, 1964, a hearing was had on this account and the objections of the defendant thereto, simultaneously with objections to the confirmation of a previous sale containing a request for a determination of both partner's capital accounts. At this hearing the

intervener was allowed to participate although previous filings by it were later stricken. It also asked that the capital accounts of the partners be set and determined before the court ruled upon the application for confirmation. Evidence was offered on behalf of the plaintiff, the defendant, and the intervener, and the matter was taken under advisement by the court. On July 29, 1964, the court entered its order finding the balance sheet was the best obtainable under the circumstances and the capital accounts of the parties were correctly shown thereby as of April 13, 1960. It further found that on that date the partnership had a capital deficit of $28,-991.78 and was overdrawn at the bank in excess of $53,-000; that the partnership was insolvent; and that the franchise, good will, and going concern then had no value. It held defendant on that day had a capital deficit of $100,060.97 and was not entitled to share in the profits subsequently earned.

On August 11, 1964, the intervener filed its petition in intervention pursuant to permission granted it on July 29, 1964, at which time its early pleading had been stricken.

On September 4, 1964, the defendant and intervener were granted a new trial for the submission of evidence as to the value of the business and the determination of the capital accounts as of April 13, 1960. A new trial was had on October 5 and 7, 1964, and further evidence was taken. On November 30, 1964, the trial court entered an order reinstating its order of July 29, 1964, and the defendant and intervener have appealed from an order overruling their motion for a new trial on the order reinstating the order of July 29, 1964.

The intervener contends the judgment of the trial court is contrary to the law and the evidence because of certain of its findings and conclusions which are needlessly repeated and successively related to each of the court's rulings. Those necessary to be determined will be stated as discussed.

The intervener maintains the trial court erred in finding the good will of the partnership had no value on April 13, 1960. It insists that it had great value which, if properly determined, would have greatly increased the capital accounts and would have resulted in the defendant having an interest in the subsequent profits earned.

Defendant testified that there was a rule of thumb to determine the value of the intangible assets such as good will, franchise, and going concern in a pepsi-cola business. He stated this rule was to multiply the number of cases sold the previous year by $1.50, and in this instance where 140,194 cases were sold, it would have been $210,291. He stated this was in addition to the value of all physical assets. He testified he was familiar with the method of valuing similar intangibles for the beer business which, he said, would vary from 25 cents to $1 a case of beer sold, depending on the profits for the preceding year. The value of good will of the beer business in suit, using his formula, is not shown. The receiver, Paul Jones, testified the rule of thumb in the sale of a pepsi-cola business was $1 per case for all bottled goods for the previous year but that this included not only the franchise and good will but also the machinery and equipment used in connection with such a business. He said it included everything but the cash on hand, accounts receivable, and inventory. In 1959, 208,324 cases of soft drinks of all kinds were sold and using his rule, the franchise, good will, machinery and equipment, put together, would have had a value of $208,324.

In addition, the report of the auditor disclosed the balance sheet on April 13, 1960. It showed assets of $95,066.80 and liabilities of $131,896.45, making a net deficit of $36,829.65 in assets on that day. The report contained also an operating statement of the business from December 31, 1959, to the close of business on April 13, 1960. It showed a net loss in that period of

$2,095.63 which was reflected in the balance sheet. The capital accounts of the partners were shown. The defendant's capital account was shown to be a minus $107,898.84, and the plaintiff's $71,069.19. The trial court further adjusted the defendant's capital account in his favor because of error in arithmetic, concerning which there is no appeal by the plaintiff, making it a minus $100,060.97 on April 13, 1960. It would appear that if the good will and franchise of pepsi-cola were valued at defendant's figure of $210,291, and half of it added to the defendant's capital account of a minus $100,060.97, the defendant's capital account would be increased to $5,084.53, but the evidence is in conflict and the condition of the partnership's affairs enter into the determination of value. Defendant would still be, however, indebted to the partnership by reason of the $40,378.81 because of his conversion of the miscellaneous receipts.

The contents of various pleadings filed by the defendant before the intervention show that the receiver had been operating on a temporary authorization to continue bottling pepsi-cola from the Pepsi-Cola Company of New York, dated August 1, 1961, to expire October 31, 1961. The New York company claimed the franchise granted the partnership in 1948 was terminable at any time by either party and was not transferable without its consent. Pepsi-Cola Company of New York granted a further temporary extension to bottle its products but purportedly terminated all such temporary authority by letter dated November 30, 1962. Defendant recognized the danger to the business in his pleading, wherein he stated: "* * * that a profitable bottling business cannot be carried on in Alliance without a Pepsi-Cola bottling appointment; that irrespective of the correctness of the action of the Pepsi-Cola Company said Receiver will not be furnished the necessary ingredients for the bottling of Pepsi-Cola and that if said sale is postponed such business will be operated at a loss for an indefinite period of time, and that if such

sale is postponed until the plaintiff's and the Receiver's rights against the Pepsi-Cola Company are adjudicated the assets in the possession of the Receiver will be diminished and wasted and that all of the assets in the possession of the Receiver will be wagered on the outcome of such suit against the Pepsi-Cola Company; * * *." Defendant maintained the franchise with the Pepsi-Cola Company of New York was not saleable or transferable and the receiver could not transfer any rights to it. Meanwhile, a new franchise had been issued to the Mid-West Bottler's, Inc., of which the defendant was an employee and stockholder. To obtain the necessary ingredients, the trial court authorized the receiver to bring suit for the determination that the franchise was perpetual and assignable, which was done, and such determination was made, and the Pepsi-Cola Company of New York was enjoined from furnishing its secret formula to others in the area. This is of record herein as well as having been set out in the opinion in Jones v. Pepsi-Cola Company, 223 F. Supp. 650. From December 31, 1959, to April 13, 1960, while the company, according to the balance sheet, had a net loss of $2,095.63 and its assets were depleted as stated, the defendant drew $8,978.07 from the firm. The trial court found that, considering the financial condition of the partnership and the precarious condition it faced from the excessive withdrawals of the defendant and the uncertainty of its franchise on April 13, 1960, its good will, franchise, and going concern had no value at that time.

This court in Iman v. Inkster, 90 Neb. 704, 134 N. W. 265, held: "The good will of a dissolved partnership is a part of the assets of the firm." In 40 Am. Jur., Partnership, § 351, p. 376, it is stated: "The partner claiming an allowance for his share of the good will must show its value by evidence, and if none is shown to exist he will not be entitled to receive anything." It is not necessary to determine whether this rule should be applied in all cases. We do conclude, however, that in the case before

us where the defendant, who as managing partner has had the exclusive control of the production, sales, and distribution of the products of the partnership, seeks to establish the value of the good will and franchise thereof, the burden of doing so will rest upon him. The record before us does not indicate he has met that burden and we are in accord with the determination of the trial court that the good will and franchise of the partnership had no value on the date of dissolution.

The next objection to the judgment concerns the finding that the partnership's bank accounts were overdrawn more than $53,000. The intervener claims the accounts were overdrawn in a much lesser amount and if the correct amount was shown the balance sheet would not have shown insolvency. The principal place of business of the partnership was at Alliance, Nebraska, where the actual bottling of pepsi-cola and other ingredients was performed. It, however, had maintained warehouses and ancillary facilities at Valentine, Scottsbluff, and Sidney, Nebraska. It maintained bank accounts in all of these cities. On April 13, 1960, the books of the banks in the towns hereafter listed showed credits to the partnership accounts therein in the amounts set out hereafter to which, in some instances, items of credit in transit are added: Nebraska State Bank, Valentine, $1,590.49; an unnamed bank at Scottsbluff, $2,096.17, transit items $185.95, total $2,282.12; American National Bank, Sidney, $2,963.26, transit items $110.51, total $3,073.77; and an unnamed bank at Alliance to the credit of Pepsi-Cola Bottling, including transit items, $3,926.95, and to the credit of Standard Bottling Company, $4,868.72, transit $1,214.32, total $6,083.04. The controversy concerns the outstanding checks on April 13, 1960, all of which were later paid by the receiver at the banks on which they were drawn in the following amounts on the several banks, to wit: Valentine, $6,891.02; Scottsbluff, $11,498.46; Sidney, $16,307.14; Alliance Pepsi-Cola account, $28,043.98; and Standard Bottling Company,

$7,028.34. The balance sheet treated the bank accounts as though all the outstanding checks had been paid on April 13, 1960, which left an overdraft in the combined bank accounts of $52,812.57 which is approximately, but not in excess of, $53,000.

Some of these outstanding checks are what a member of the auditing firm who testified termed "internal checks." We will hereafter refer to this witness as the auditor. He designated these internal checks as those drawn on the banks at Valentine, Scottsbluff, or Sidney in favor of the partnership which were to be later deposited to the partnership account at the bank at Alliance. It is, of course, obvious that any checks issued to the partnership by the partnership and later deposited by it to its credit in another bank would not alter or deplete the aggregate partnership's bank account. In this case the auditor's testimony shows that not all of the checks drawn on the banks at Valentine, Scottsbluff, or Sidney were "internal checks" but most of them were, to wit: At Valentine, $6,670.22; at Scottsbluff, $11,-195.01; and at Sidney, $15,849.68. The auditor testified none of the checks, either of Pepsi-Cola or Standard Bottling Company, on Alliance were internal checks. The intervener contends these internal checks, totaling $33,714.91, should not have been counted as outstanding checks and would not affect the partnership bank accounts.

We do not think the "internal checks" can be disposed of so lightly. It is necessary to consider the evidence with respect to the partnership books and the circumstances and purpose for which the checks were drawn. We think this may be reasonably and fairly inferred from the evidence in the record. When, for instance, the warehouse at Valentine ordered pepsi-cola, the trucks at Alliance took it from the warehouse there to that at Valentine. The check on Valentine was then drawn. It appears to have been physically written at Alliance. On the Valentine books it was credited to the bank and

debited to the warehouse purchases in accounts payable. Until the check was cashed at Alliance the value of the shipment in the amount of the check was credited to sales on the warehouse books and charged to warehouse accounts receivable. When the bank account at Valentine permitted the checks to be paid they were cashed at Alliance and charged to the bank there and credited to the warehouse accounts receivable on the books there. It seems clear this was a method to keep score on the bottled merchandise going out of the warehouse at Alliance to the other branches of the business until settled for. It is clearly inferable from the evidence that those in charge of the branch offices were to deposit the receipts from deliveries made from their warehouse in their respective bank at the branch. If, in the end, the checks were not paid the merchandise represented by the accounts receivable at Alliance and purchases payable at Valentine would remain unpaid and their value lost. The undisposed portion of the merchandise in the warehouse would be, of course, reflected in the inventory. The same method of issuing checks and carrying the accounts was followed at Scottsbluff and Sidney.

The intervener claims the internal checks either should have been disregarded or else they should have been treated as cash. The auditor states: "No adjustment was made in the bank account, because the checks were issued, outstanding, and they had been charged to purchases on the warehouse records. And they were subsequently deposited to the Alliance bank account. The warehouse accounts receiveable (sic), due in Alliance, were only set up at the end of each year. The amount of this payable, which was set up as being owed by the warehouses to Alliance, was shown on the Alliance record as accounts receiveable (sic) due from warehouse. Since the checks previously issued by the warehouse, and charged to purchases at the time issued, were being held because of insufficient funds in the warehouse

bank account. This resulted in an overstatement ·in purchases to the extent of the amount of the oustanding (sic) checks.

"We adjusted the payables and purchases by the amount of the checks that had been issued and were outstanding at December 31st, and had previously been charged to purchases.

"Now, if we had ignored these outstanding checks, and adjusted the bank account for them, an adjustment in like manner would have to be made to accounts payable, and the net effect on the capital accounts would have been none." Also, he testified if he had treated the checks as cash, he would have had to reduce the accounts receivable and the assets would have remained the same.

It appears, therefore, that however these checks are considered the liabilities of the partnership remains the same, showing a shortage either in the bank or in the warehouse. The auditor treated them as checks afloat against the bank account on which they were issued and from which the receiver later paid them. This was done in accordance with the entries on the books maintained by the defendant. We think there was no error in so doing.

Other complaints are made as to the auditor's balance sheet. They involve amounts proportionately so small that alone they could not possibly result in reducing the deficit in defendant's capital account enough to show he had an interest in the partnership on April 13, 1960. Some of them only will be mentioned.

The ·intervener claims that the trucks and other important items of machinery had been depreciated too rapidly and that the equipment which was valued at $85,294.21, being the depreciated value on the books, should have been revalued. The auditor took this from the books of the partnership which this court charged the defendant with the responsibility of keeping. Essay v. Essay, 175 Neb. 689, 123 N. W. 2d 20. In Frey v. Hauke, 171 Neb. 852, 108 N. W. 2d 228, it is stated: "A

managing partner who acquiesces in the matter of the depreciation relating to the partnership business as set up by an accountant is in no position to complain about such depreciation."

The intervener claims that certain items of expense such as advertising, insurance, and rent, covered in part items which would accrue after April 13, 1960. It contends the prepaid portion of the items should have been excluded from the items of expense for the period in question on the operating statement. The auditor, while admitting this might have properly been done, explained that they were computed as paid. He said if items paid during the period prepaid in part obligations to accrue thereafter were excluded, payments of expense made thereafter which included expense for the period in question should be added.

A certified public accountant, who testified for the defendant and intervener, maintained the balance sheet as prepared by the auditor appointed by the court was incomplete and inaccurate. He said the balance sheet was prepared on an accrual basis and any prepaid items should have been set out. The auditor testified that he prepared the balance sheet from the books of the partnership which, in some respects, were incomplete and that some statements were missing. The inventories on the books were in dollar totals and not in physical assets. He stated it was the best the accountants could do because there were so many unknowns. It is to be noted that the balance sheet was prepared more than 4 years subsequent to the date in question.

In Essay v. Essay, 175 Neb. 689, 123 N. W. 2d 20, this court determined in the same proceeding: "A managing partner having exclusive control of a partnership business not only controls production, sales, and distribution of products but is responsible for keeping all records and books of account, * * *." This court in its prior opinion also held that Edward as managing partner had a continuing duty to keep the books and records

accurately and the entries therein are conclusive as against him. "When a question of fact is once determined on its merits, that question is settled so far as the litigants are concerned and it may not be relitigated between the same parties." Frey v. Hauke, 171 Neb. 852, 108 N. W. 2d 228.

These determinations were made before the petition in intervention was filed. "Ordinarily, an intervener must take the suit as he finds it, is bound by the previous proceedings in the case, and cannot complain of the form of the action or of the informalities or defects in the proceedings between the original parties." State ex rel. Nelson v. Butler, 145 Neb. 638, 17 N. W. 2d 683.

In this case, we further hold that a managing partner, who has been held by the court to be responsible for keeping its records and accounts, has the burden of showing any errors in a balance sheet prepared from such accounts by an auditor appointed by the court pursuant to a stipulation of the partners in which such managing partner joined. Having examined the record presented to the trial court, we adopt the balance sheet prepared by the accountants appointed by the court and find under the evidence received that on the date of the dissolution of the partnership on April 13, 1960, the defendant Edward Essay had no interest in the partnership assets and therefore no interest in the profits earned after dissolution.

The second appeal herein is from the trial court's order confirming the sale of the business, including the good will and franchise of the partnership, to Martha Essay for the sum of $366,000. There were three sales herein. The first, which was held at public auction on April 27, 1964, after extensive advertisement, resulted in Martha Essay being the highest bidder in the sum of $294,000. This was set aside at the instance of the defendant. At the second one held September 8, 1964, the defendant made the high bid of $333,000 but he did not perform his bid. The trial court found there

had been no sale and offered the same for sale in open court but no bids were received. Declaring the bidding was open, it deferred further action concerning the sale on defendant and intervener's motion until after the determination of the capital accounts of the partners. By the order of the court on November 30, 1964, the sale was continued until January 5, 1965, at 10 o'clock a.m. On that day an auction was held in open court at which the plaintiff and Western Bottlers Company, an Iowa corporation, were bidders, resulting in a sale by the court to Martha Essay for $366,000 which the court on the same day confirmed.

The intervener in its brief does not contend that the partnership property did not sell for a fair and reasonable value, nor that a subsequent sale would bring a greater amount. The only argument made in the brief of the intervener is to contend that the trial court erred in sustaining a motion made by the plaintiff shortly after confirming the sale for permission to give her credit for all of her bid in excess of $60,000 upon her capital account, the profits, and any amounts due her from the defendant. This, it is urged, amounts to changing the terms of the sale after confirmation.

Lockwood v. Cook, 58 Neb. 302, 78 N. W. 624, was an action of foreclosure of a real estate mortgage. There was a decree and sale. At the sale the plaintiff in the action, whose lien was the first one, purchased the property at a sum less than the amount to which he was entitled under the decree. It was held not a forceful objection to confirmation of the sale that the amount bid had not been paid to the officer in money; and that it was unnecessary that the formality of handing the money to the officer by the plaintiff and purchaser and its return to him by the officer should be observed. In In re Renne, 55 F. Supp. 868, the federal court for the district of Nebraska cited and discussed Lockwood v. Cook, *supra,* and other cases and authorities, and concluded that under Nebraska law a lienholder may re-

ceive credit on his bid at a judicial sale to the extent that, under the decree, the purchase price is applicable on his lien. In the present case the court had already found the plaintiff had an investment account which exceeded $190,000 and that she was entitled to the profits from the business after the dissolution. These profits have been quite substantial during the receivership. Plaintiff did assume certain obligations to pay the partnership creditors. She made application to the court to be allowed credit for that part of her bid which exceeded $60,000. The court had cognizance of the reports of the receiver and the auditors before it granted this credit. We think under the circumstances there was no error in its so doing.

After considering the contentions urged by the intervener we find no error in either of the judgments of the trial court appealed from and the same are therefore affirmed.

AFFIRMED.