Harry R. WALKER II, Plaintiff,

v.

Harry R. WALKER, M.D., and Walker
Land & Cattle Co., Defendants.

No. 4:CV93–0358.

United States District Court,
D. Nebraska.

June 8, 1994.

David A. Domina, Domina & Copple, P.C., Omaha, NE, for plaintiff.

Robert J. Murray, David J. Schmitt, Kennedy, Holland, Delacy & Svoboda, Omaha, NE, for defendant.

## MEMORANDUM OPINION, INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

KOPF, District Judge.

The bench trial concluded, I now issue my findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.[1]

## I. Background.

This is a diversity case in which Nebraska law applies.[2] Harry R. Walker, II (Joe[3]), a resident of California, seeks dissolution of Walker Land & Cattle Co., a Nebraska partnership (WLC), and an accounting of the interests and liabilities of each of the partners in WLC, including those of Harry R. Walker, M.D. (Harry), a resident of Nevada.

Joe is a Stanford-educated businessman in his fifties who holds a master's degree in business administration. Harry is a semi-retired orthopedic surgeon in his eighties. Harry and Joe are father and son. WLC owns and operates what is now a relatively small farm in north central Nebraska. For many years the same local tenant has farmed the WLC ground under a variety of arrangements. Joe has managed the business, and Harry has until recently taken very little interest in the day-to-day management of WLC. Sometime in 1993 Harry tried to take over the active management of WLC.

Joe and Harry have done business together, primarily in a variety of agricultural endeavors, for many years. After college, Joe worked for a number of years for large banks in California and for a time in Nebraska. As a consequence, he became familiar with and interested in agriculture as a business. Harry was interested in investing.

Harry and Joe began forming partnerships to conduct a variety of agricultural businesses in Iowa, Nebraska, and California. These partnerships provided Harry with significant tax advantages, and in turn they later provided Joe with an opportunity to leave his banking work and pursue full-time management of the family businesses.

Although Joe later advanced significant amounts of cash to WLC, at the inception of WLC Harry injected the relatively modest start-up cash that was needed and Joe provided the management. A reputable law firm in San Francisco that had long represented Harry prepared the WLC partnership

---

1. Any finding of fact more properly construed as a conclusion of law shall be so construed. Any conclusion of law more properly construed as a finding of fact shall be so construed.

2. Nebraska has adopted the Uniform Partnership Act. Neb.Rev.Stat. § 67–301 *et seq.* (Reissue 1990).

3. *"Joe"* is a nickname used by the Plaintiff rather than his given name.

agreement. Other partnerships were formed (such as El Rio) which are not directly involved in this case except to the extent those partnerships may owe money to WLC or WLC may owe money to those partnerships.

Upon the death of Harry's wife and Joe's mother in 1986 and the subsequent remarriage of Harry, the relationship between Joe and Harry soured. The deterioration of the relationship has provoked a variety of disputes between Harry and Joe, and the present Nebraska litigation is but only a part of that continuing family discord.

At the bench trial, Joe and Harry agreed that a dissolution of WLC is required, that the business should be wound up, and that an accounting should be made.

The following issues, summarily stated, remain for resolution:

(1) under what provisions of Nebraska law should the partnership be dissolved, wound up, and an accounting provided?

(2) who are the partners and what are their respective equity interests?

(3) what are the assets and liabilities of WLC (including loans or advances from partners, fees due partners, and whether such amounts, if due, draw interest)?

(4) how should WLC be wound up?

(5) should the court impose Rule 11 sanctions against Harry regarding a now-dismissed counterclaim and motion to change venue, and, if so, what are the appropriate sanctions? [4]

(6) should a judgment be entered at this time, and, if so, in what form?

## II. Findings and conclusions on dissolution, winding up and accounting.

██ Under Nebraska law a partnership may be dissolved by a court when, among other things, "circumstances render a dissolution equitable." Neb.Rev.Stat. § 67–332(1)(f) (Reissue 1990). When dissolution is ordered by the court, any partner may, upon cause shown, "obtain winding up by the court." Neb.Rev.Stat. § 67–337 (Reissue 1990). Moreover, under Nebraska law any partner is entitled to an accounting at the time of dissolution, which in this case is the date of trial. Neb.Rev.Stat. § 67–343 (Reissue 1990).[5]

██ Such court-ordered dissolution, winding up, and accounting are required here because Joe and Harry cannot agree on how to profitably operate the partnership, wind up their affairs, or arrive at an accounting. Therefore, I find and conclude that equitable dissolution is appropriate under section 67–332(1)(f), court-ordered winding up is appropriate under section 67–337, and a court-ordered accounting is appropriate under section 67–343.

I make no other findings or conclusions about whether dissolution, winding up, or accounting are justified under any other provisions of Nebraska law.

## III. Who are the partners and what are their interests?

██ The evidence on this question is comprised primarily of Harry's tax returns, (Exs. 97–103), Elizabeth Walker's estate tax returns, (Exs. 105–107), California probate court records, (Exs. 19–20), the stipulated testimony of a California attorney, (Ex. 188), the partnership agreement and amendment, (Ex. 30), and the trial testimony of Harry and Joe. From a review of the evidence,[6] the following is evident.

The partnership was first organized as a California partnership, and later amended so that it became a Nebraska partnership.

---

4. The parties agreed this issue would be resolved as part of the trial on the merits.

5. It should be remembered that "[o]n dissolution the partnership is not terminated but continues until the winding up of partnership affairs is completed." Neb.Rev.Stat. § 67–330 (Reissue 1990). Thus, during the winding-up phase, the partners may be entitled to accountings pursuant to Neb.Rev.Stat. § 67–322(d) (Reissue 1990).

6. It should be noted that on this question, and every other question, I had an opportunity to carefully listen to and evaluate the testimony of Joe and Harry during the trial. Generally speaking, I found Joe credible, and Harry less than credible, on many issues. Although Harry is of advanced age, he struck me as a fully competent, strong-willed person who, for reasons that are unclear, was less than candid much of the time.

Harry and Joe signed the written partnership agreement. When the partnership began more than 25 years ago, it was held 10 percent by Joe, and 90 percent by Harry. By 1977, Joe had acquired an additional 10 percent interest in WLC from Harry.

When Mrs. Walker died in 1986, she and Harry were residing in California. Accordingly, she had a community-property interest in Harry's 80–percent share of WLC. Thus, when she died, Mrs. Walker's estate received a one-half interest in Harry's 80–percent interest in WLC. So far as can be determined, that interest was undivided. This one-half interest in Harry's 80–percent interest in WLC was, by virtue of Mrs. Walker's Will, conveyed to Harry as trustee of the testamentary trust of Elizabeth L. Walker. The beneficiaries of the trust are Harry (during his life) and, upon Harry's death, Joe and his brother David.

It is important to distinguish between the question of who is a partner in a partnership and, therefore, who has rights and liabilities as a partner, and who has some other interest in the partnership, but no partnership rights or liabilities.

I do not believe that the Elizabeth L. Walker Trust ever became a partner in WLC so as to be charged with the liabilities of WLC (or given rights as a partner in WLC). There is simply no evidence that Harry in his fiduciary capacity for the Elizabeth L. Walker Trust (or anyone else) ever bound the trust to any partnership agreement.

The partnership agreement specifically contemplates that upon "subsequent change in the membership of the partnership, the partners shall sign, file and publish in the County in which the principal place of business is situated [a document] setting forth the name and residence of each partner, as required by statute." (Ex. 30 ¶ 1.1.) There is no evidence that any such document was filed.

All the money distributed went to either Joe or Harry, not the trust.[7] Moreover, Harry, Joe, and WLC's accountant acted as though Harry in his individual capacity was the partner, not the trust. (Ex. 92, 1990 Schedule K–1, describing Harry as the partner, holding an 80–percent interest in profits, losses, and capital, and answering the question, "What type of entity is the partner?" with the description, "Individual").

■ Under Nebraska law, part ownership or similar interests in partnership property do not create a partnership, whether or not such co-owners share in profits or returns. Neb.Rev.Stat. § 67–307(2) & (3) (Reissue 1990). Moreover, assignment of a partner's interest "does not ... dissolve the partnership nor, as against the other partners in the absence of agreement, entitle the assignee, during the continuance of the partnership, to interfere in the management or administration of the partnership...." Neb.Rev.Stat. § 67–327 (Reissue 1990). Therefore, the fact that the trust is some type of co-tenant regarding Harry's partnership interest does not make the trust a partner.

■ Of course, it is possible for a person (or entity) to become a partner by estoppel. Neb.Rev.Stat. § 67–316 (Reissue 1990). The hallmark of estoppel is detrimental reliance. *Havelock Meats, Inc. v. Roberts,* 186 Neb. 73, 78, 180 N.W.2d 875, 878 (1970) (construing section 67–316 and holding that under "the doctrine of partnership by estoppel, it is essential to the cause of action that the party asserting liability against a nonpartner must have been induced by misleading appearances to change his position to his detriment."). There is not the slightest evidence that Joe or Harry (individually) ever changed their positions because of some misleading act of the trust regarding its status as a partner. Moreover, there is no evidence that the trust changed its position because of some misleading act of Harry or Joe regarding the trust's status as a partner.[8]

---

7. It must be recognized, however, that Harry was the income beneficiary of the trust so that the receipt of income (or loss) by Harry as an individual has reduced significance.

8. It may well be that Harry has some responsibility to the trust to account for his acts and doings as a partner in WLC. Be that as it may, any disputes between Harry and the trust are not the proper subject of this litigation.

In summary, I find and conclude that: (a) the trust was not a partner, and has no partnership rights or liabilities; (b) Harry owns an 80–percent interest in WLC, subject to the undivided interest of the Elizabeth L. Walker Trust to the extent of one half of Harry's 80–percent interest; (c) Joe has a 20–percent interest in WLC; and (d) Harry (in his individual capacity) and Joe are the only partners of WLC.

## IV. What are the assets and liabilities of WLC?

### A. Are WLC's accounting records adequate?

Before determining what the assets and liabilities of WLC are, it is necessary to resolve a fundamental question: Are WLC's accounting records adequate to support an accurate determination of the assets and liabilities of WLC? I find and conclude that the accounting records are adequate.

Harry argues that Joe was the managing partner of WLC and therefore the burden of proof is upon Joe to establish an adequate accounting. *See Essay v. Essay*, 180 Neb. 47, 54–55, 141 N.W.2d 436, 441 (1966) (Where managing partner who had exclusive control of the business sought to establish the value of the business in a partnership dissolution the burden of establishing the value rested with the managing partner). Harry likes to portray himself as an overindulgent father being abused by a thieving son who managed the business.[9] Harry argues in this vein that Joe has failed in his burden of proof, and that all inferences should be drawn in favor of Harry.

There is no dispute that Joe was the managing partner. There is, however, substantial disagreement about whether the records of WLC are adequate.

■ Assuming for the sake of argument that Joe has the burden of proof on the records issue, I am satisfied that WLC's records, including the accounting records, are adequate, and that Joe has generally satisfied his burden of proof regarding the adequacy of the records.[10] I reach this conclusion for three reasons.

First, until Harry took over in 1993, the records were kept and prepared by a highly competent unbiased professional. Since the inception of the partnership the accounting records have been maintained by the same certified public accountants in Omaha, Nebraska. Ron Ferdig, the CPA who handled the WLC account throughout most of the years of WLC's existence, testified at trial. He was very credible, and evidenced not the slightest bias in favor of or against Harry or Joe.

Ferdig's firm had been hired by Joe. Joe had worked for a variety of large banks, and Ferdig's firm had been recommended to Joe by a banker friend. Ferdig's firm did and does a substantial accounting business with partnerships involved in farming.

Ferdig testified that WLC's records are kept on the cash basis. The partnership agreement required that the books be kept on the cash basis. (Ex. 30 ¶ 7.1.) Ferdig stated that virtually every farm partnership he does work for keeps records on the cash basis. A CPA cannot express an unqualified opinion when books are kept on the cash

9. For example, Harry points out that Joe took more than $800,000 out of Joe's "account with partners" in WLC, and Harry took only $3,000 from his "account with partners." (Ex. 189.) (These were accounts set up to deal with loans to and from partners and the like.) While this is true, it is irrelevant, and does not suggest the slightest impropriety on Joe's part. As the accounting later discussed in detail documents, while Joe took large sums of money from WLC, he also loaned WLC substantially more than he withdrew, ending with a balance owed Joe by WLC of nearly $140,000. Still further, as discussed in detail later, Joe contributed over $40,-000 more than his share of the profits required. In effect Joe was paying a portion of what Harry

owed WLC. Finally, I note that the evidence is clear that Joe from time to time sold his home and a farm to continue to inject funds into ventures that Joe and Harry operated together and with others. As a consequence of these facts (and others), Harry has very little "equitable" grounds for complaint.

10. I do not mean to suggest that each position advanced by Joe is supported by the records. I mean only that the records are generally sufficiently accurate to allow a reasonable finder of fact to make an informed decision without undue speculation on the respective positions advanced by Joe and Harry.

basis, since accounting principles require that unqualified opinions be predicated upon accrual basis records. In any event, Ferdig testified that at least since 1983 the books and records of WLC were adequate for the purpose of conducting a farming partnership like WLC.

Second, although he was able to examine the records since the partnership began, Harry never questioned the records until 1993 when he took over management of WLC. As a consequence, the partnership agreement forecloses Harry from mounting a substantial challenge to nearly all of the accounting records.

Ferdig testified that in the early 1980's WLC also engaged in certain farming transactions with other individuals, and during that time the records were not adequate to evidence the relationship between WLC and other persons and entities. However, Ferdig testified that in 1983 he prepared an unaudited report regarding the financial affairs of WLC and the others for use in an arbitration proceeding in San Francisco and litigation in Nebraska where Joe and Harry were aligned together against the others. (Ex. 219.) That report was used to represent the interests of Harry and Joe. Joe testified at trial that Harry meet at least once with California counsel regarding the report and that Harry was satisfied with it. Through their counsel in the arbitration proceeding, both Harry and Joe advanced the 1983 report as properly representing the position of WLC.

Ferdig also testified that until Harry took over he prepared annual adjusted trial balances, (Exs. 23–29), with supporting schedules, (*e.g.*, Exs. 5, 181), which were based upon documents, such as check registers, (*e.g.*, Ex. 39), provided to him by Joe.[11] Joe testified that the trial balances were sometimes sent either to Harry or to his accountant, and the evidence supports this statement. (*E.g.*, Ex. 18.) In any event, it is clear that the trial balances were always available to Harry.

Furthermore, Ferdig also prepared partnership tax returns. (Exs. 81–89.) It is undisputed that Harry has been required to sign and file tax agreements in Nebraska when the partnership returns were filed. The Nebraska partnership tax returns would have contained much of the accounting information prepared by Ferdig. (*E.g.*, Ex. 92, form 1065N.) Those returns required Harry to sign and file with the partnership returns a Nebraska Nonresident Income Tax Agreement. (*E.g.*, Ex. 92, form 12N.) This evidence suggests that Harry would probably have reviewed (or had available for review) the partnership tax returns and the associated accounting information supplied in the returns.

■ The partnership agreement that was executed between Harry and Joe dealt with the issue of accounting information. That agreement provided that a "yearly accounting shall be made as soon as is practical after the close of the fiscal year and shall be available to the partners." (Ex. 30, ¶ 7.2.)[12] The agreement also explicitly provides that: "This accounting shall be conclusive on the partners and shall not be modified except for some manifested error discovered and protested within two (2) years from the date of the accounting." (*Id.*)

The relations of one partner to another are generally governed by Neb.Rev.Stat. § 67–318 (Reissue 1990). The statute explicitly contemplates that the statutory rights of partners are "subject to any agreement between them." This has been interpreted to mean that the partners are generally free to set forth their respective rights and obligations in any manner they see fit. *See, e.g., Smith v. Daub*, 219 Neb. 698, 702–03, 365 N.W.2d 816, 819–20 (1985) (The provisions of Neb.Rev.Stat. § 67–318 may be modified either by an agreement between the partners or by a course of dealing amounting to an agreement between the partners.) Since Harry did not once question any of the accountings rendered by Ferdig until Harry tried to take over WLC in 1993, Ferdig's

---

**11.** It should be noted that Ferdig did not have all of the records for 1993 and thus could not prepare a 1993 trial balance.

**12.** Aside from keeping the books on the cash basis, the agreement does not specify in what form the books or accountings were to be maintained or provided.

accountings, rendered two years or more prior to 1993 [13], must be presumed to be accurate.[14]

Third, even if one ignores Harry's failure to timely question the accountings, before I may ignore Ferdig's accountings I must be certain, according to the partnership agreement, that the accountings contain "manifest error." Harry hired a former IRS tax investigator to examine the trial balances and testify. The investigator was not a CPA. Although the investigator strangely failed to examine the supporting schedules to the trial balances, the investigator was critical of the records of WLC. However, the investigator was unable to establish "manifest error," or anything remotely suggesting fraud. Generally speaking, I am satisfied that the books, records and accountings of WLC contain no "manifest error."

In summary, I conclude that the records maintained by WLC are adequate because: (a) most of the significant accounting records were kept by a highly competent unbiased professional; (b) Harry never protested, in accordance with the partnership agreement, the annual accountings that were either provided to him or available for his inspection; and (c) no "manifest error" has been demonstrated. Joe has met his burden of proof in this regard.

**13.** Since the 1991 and 1992 trial balances are based in part upon the earlier trial balances, Harry is also foreclosed from attacking the later trial balances to the extent the later trial balances merely incorporate the findings and conclusions set forth in the earlier trial balances.

**14.** For example, this provision of the partnership agreement, (Ex. 30 ¶ 7.2), thereby forecloses Harry from challenging the fact that Joe loaned WLC more than $177,000 in 1981 from the sale of his own land. In any event, and as discussed in more detail later regarding Joe's claim for interest, the California lawyers who had long represented Harry certainly believed that such a loan had been made (or was about to be made) by Joe. (Ex. 157.) Other exhibits support Joe's claim as well. (Exs. 158 (closing statement), 196 (receipt from PCA).)

**15.** Exhibit 37 was prepared by Ferdig and Joe, with the assistance of counsel for Joe, largely using the trial balances Ferdig had prepared over the years. (*E.g.*, Ex. 29.)

## B. What are the assets of WLC?

I find and conclude that with minor exceptions the balance sheet appearing as exhibit 37 [15] sets forth the assets of WLC as of the date of trial.

Exhibit 37, as supplemented with other evidence presented during trial, establishes that the following are the assets of WLC together with the estimated value of each asset at the date of trial [16]:

1. Cash on hand or in banks or held by others:

 a. Chambers, NE, Bank: $1,000.00

 b. Bank of America, Reno, NV: $3,000.00 [17]

 c. 1993 grain sales to Cargill and held by Cargill: $38,000.00

 d. 1993 Farm Program Payment (held by government): $12,000.00 [18]

2. Real Estate Contract Receivables:

 a. H. Fritz contract: $22,399.97

 b. M. Fritz contract: $5,599.93

 c. S. Garber contract: $5,242.24

 d. Norris Trust contract: $4,888.96

3. El Rio loan: $212,042.20 (principal only)

4. HW Ranches loan: $2,500.00

5. Approximately 640 acres of real property in Wheeler County, NE, and improvements: $400,000.00 [19]

**16.** Shortly before trial the court appointed a receiver, and the receiver may have subsequently taken possession of some or all of these assets.

**17.** This probably represents the 1994 Norris principal-and-interest payment deposited into a Reno bank account by Harry. If it does not, the assets should be increased by the amount of the Norris payment in the sum $2,444.44 of principal plus $623.34 of interest.

**18.** Apparently the government disputes this claim, and it therefore may be of doubtful value.

**19.** Generally described as: Southwest 1/4 of Section 19, Township 22 North, Range 11, West of the 6th P.M.; Northeast 1/4 of section 23, Township 22 North, Range 12, West of the 6th P.M.; and the South 1/2 of Section 24, Township 22 North, Range 12, West of the 6th P.M.; all in Wheeler County, Nebraska.

6. An old quarter horse in the possession of Harry: $1.00

7. As-yet-unrealized income from 1994 farming season: amount unknown

A number of qualifications are in order.

First, the values set forth opposite each asset are estimates only. The ultimate value will not be established until the partnership business is wound up, and the assets liquidated.

Second, some of the assets, such as the El Rio and HW Ranches loan are doubtful in that there may not be any notes in existence, the statutes of limitation may have run or there may be other impediments to collection. In this connection, I note that these loans appear to have been transfers of funds from WLC to partnerships in which Harry (individually) and Joe apparently had interests. Joe does not dispute these loans, and Harry, although not disputing that WLC advanced the monies for these loans, apparently argues that the loans are so doubtful they should not be recorded as assets. While the ability or inability to collect on these assets may dictate how the assets should be dealt with in the winding-up process, since the books of WLC reflect these loans as assets they must not be ignored.

Third, 40 acres of the approximately 640 acres of real estate are titled in Joe's name (or those of Joe and his wife) and admittedly held for the benefit of WLC. Joe agrees that he should be ordered to convey this property to WLC as he holds the property as a constructive trustee. Neb.Rev.Stat. § 67–321 (Reissue 1990).[20] Accordingly, he is ordered to convey the 40–acre property to WLC prior to liquidation of the WLC property in the winding-up process.

**20.** The property was apparently purchased to allow WLC to develop part of the farm ground for center pivot irrigation. A WLC center pivot irrigation system uses this property to complete its circular path while irrigating this 40 acre tract and other WLC land.

**21.** This debt reflects the amount payable on Joe's purchase of the 40–acre tract of ground that he is ordered to convey to WLC prior to termination.

## C. What are the liabilities of WLC?

### 1. Liabilities for which there is no substantial dispute.

The following are liabilities of WLC taken from exhibits 29 and 37 for which there was no substantial dispute at trial, together with approximate estimates of the amount due as of trial:

1. Unpaid real estate taxes:
 a. 1992: $3,532.68
 b. 1993: $3,180.15
 c. 1994: Amount unknown
2. Balance of the Field note: $167,200.00 to $202,000.00
3. Walker Vineyards loan: $41,377.50
4. California Associates loan: $93,700.00
5. Sloan note: $4,800.00 [21]
6. As-yet-unrealized expenses of 1994 farming season, including costs of the receiver: amount unknown

It should be noted that the Field note, which represents the unpaid balance due on a real estate contract, whereby WLC purchased the original WLC land, was apparently bought by Harry (or others on his behalf) shortly prior to trial. However, if the purchase of this liability did in fact occur, Harry (or the purchaser) simply stands in the same shoes as the original owners of the contract insofar as that liability is concerned.[22]

Furthermore, the precise amount of these liabilities would necessarily have to be determined at the time of payoff. The amounts set forth above are estimates of the outstanding liabilities, and should not be construed as fixing the amount actually and precisely due.

Finally, the Walker Vineyards and California Associates indebtedness, like the El Rio and HR Ranches loan assets, may be doubtful and subject to certain defenses. But since these debts have been carried on the

**22.** If Harry is the holder of the note (or contract) due a third party, it would appear that the note (or contract) he holds would have the liquidation priority established in Neb.Rev.Stat. § 67–340(b)(I).

books of the partnership, the debts, even if nothing more than contingencies, must be recognized. Nevertheless, proper handling of these debts during the winding-up process may require special measures.

**2. Is Joe entitled to allegedly earned but unpaid management fees and interest; alternatively, should he be required to return management fees which were paid?**

Joe claims he is entitled to management fees, plus interest, earned over the years, but unpaid, in the principal sum of $51,431.00. (Ex. 73.) Harry, on the other hand, contends that Joe should be required to repay the management fees paid to Joe by WLC. I agree with Joe that he is entitled to certain management fees, but I believe the agreed management fees are much smaller than claimed by Joe and I do not believe he is entitled to any interest. I also do not believe that Joe should be required to repay management fees that he received as he was owed more management fees that he was paid. I reach these conclusions for the following reasons.

### (a)

Nebraska law provides that "subject to any agreement", a partner is not entitled to "remuneration for acting in the partnership business." Neb.Rev.Stat. § 67–318(f) (Reissue 1990).

The partnership agreement in this case provides for "agreed upon" remuneration: "Each partner shall receive such salary as shall from time to time be agreed upon, but the payment of salaries shall be an obligation of the partnership only to the extent that there are partnership assets available for them, and shall not be an obligation of the partners individually." (Ex. 30 ¶ 10.1.) Moreover, the agreement contemplates that upon dissolution a partner is entitled to any "earned and unpaid salary due him." (*Id.* ¶ 11.5(c).)

In *Barthuly v. Barthuly,* 192 Neb. 610, 223 N.W.2d 429 (1974), the Nebraska Supreme Court, interpreting section 67–318(f), stated that a "partner is not entitled to charge the partnership account for his services unless there is an express agreement that he shall

be compensated for such services." 192 Neb. at 614, 223 N.W.2d at 432. *Barthuly* also made clear that the partner seeking compensation bears the burden of proof. 192 Neb. at 613, 223 N.W.2d at 432.

The Nebraska Supreme Court later modified its position in *Barthuly* in the case of *Smith v. Daub, supra,* 219 Neb. at 702–03, 365 N.W.2d at 819–20. In *Smith,* the court held that (1) the "phrase 'express agreement' was unnecessary" when used by the *Barthuly* court; (2) section "67–318 does not require 'an express agreement' "; and (3) "the manner in which the parties dealt with each other during the life of the partnership may be considered in determining whether there was an agreement between the parties." 219 Neb. at 703, 365 N.W.2d at 820. *Smith* did not alter the *Barthuly* decision regarding the burden of proof.

### (b)

■ Basically, Joe claims that he and Harry orally agreed that Joe should be compensated at the rate of 5 percent of the gross income of WLC each year, and sometime later, that they agreed to a reduced fee of $300.00 per month when the land was cash rented and the management responsibilities thus reduced. Joe testified that he did not take all the fees he was entitled to so as to assist the cash flow of WLC. Harry denies any such agreement.

I am satisfied that throughout 1983 there existed a course of dealing between Joe and Harry and WLC that clearly entitled Joe to management fees. This course of dealing is established in two ways.

First, from 1977 through 1982, WLC paid Joe a portion of the claimed management fees every year that it had gross income, save 1978. (Ex. 73.)

Second, when Ferdig authored the 1983 report (for the years 1978 through 1981) which was used in the arbitration and later litigation with third parties, he recognized that Joe was entitled to management fees, and Ferdig used the 5 percent of gross income figure. (Ex. 219, at note 22.)

It should be emphasized that Harry and Joe both used the 1983 Ferdig report to support their joint position in the arbitration

(and later litigation in Nebraska.) This in turn is highly probative evidence that Harry agreed to management fees during this period of time of up to 5 percent of the gross.

Moreover, during part of this period of time WLC had a much larger farming operation than at present. In fact the farm was nearly three times larger than at present or about 1800 acres in size. It was also during this time that Joe negotiated the apparently profitable sales of large segments of WLC ground. This is likewise highly probative evidence that Harry would have had an incentive to pay management fees to Joe because of the size and complexity of WLC business at that time.

Pursuant to exhibit 73, Joe calculates that by the end of 1983 he had been paid $42,666 in management fees and was owed a total of $64,098 in fees, for a deficiency of $21,431 (the actual number is $21,432).[23] · I find and conclude that the evidence establishes a course of dealing where WLC and Harry agreed to pay Joe $64,098 for management fees during the period of 1977 through 1983. I am further satisfied that Joe was actually paid $42,666, and that there is thus a deficiency of $21,432 due Joe as of the end of 1983.

**(c)**

■ Joe also argues that after 1983 and through 1993 he earned management fees of $39,000, but was paid only $9,000. I am not persuaded that Joe has met his burden of proof to establish either an agreement or a course of dealing that would entitle him to these fees. Aside from Joe's testimony that the oral agreement he earlier reached with his father had not terminated, there is no persuasive evidence that Joe and Harry had any agreement during this period of time, nor is there any evidence of any course of dealing which would support such an inference.

In fact, during this period of time and for nine consecutive years, WLC paid no fees to Joe. The $9,000 payment to Joe took place in 1993 when the parties became embroiled in this dispute, and it is not therefore probative of any agreement or course of dealing. Moreover, the size and complexity of the WLC farming operations were greatly reduced during this later period of time.

■ Thus, I find and conclude that Joe is not entitled to management fees for the period 1984 through 1993 because I find no agreement or course of dealing from which an agreement could be presumed. I further conclude that the $9,000 paid to Joe in 1993 as management fees should be credited against the fees due Joe for the period 1977 through 1983. As a result, Joe is due $12,432 ($21,432 − $9,000 = $12,432) as an adjusted principal balance for management fees as of the date of trial;[24] this constitutes a liability of WLC.[25]

**(d)**

■ Joe also claims he is entitled to interest on the unpaid management fees due him. In essence, Joe claims he allowed WLC to keep a portion of his management fees so as to assist WLC in its cash flow, and is therefore entitled to interest as an advance to the partnership. Neb.Rev.Stat. § 67–318(c) (Reissue 1990) (providing in pertinent part that "subject to any agreement" a partner who makes an advance for the benefit of the partnership is entitled to interest from the date of the advance). I disagree.

There is an agreement in this case, and it expressly pertains to the question of interest. The partnership agreement provides that: "Loans and interest bearing advances by a

---

**23.** It should be noted that because the partnership agreement required that the books be kept on the cash basis Ferdig did not show accrued, but unpaid, liabilities such as these.

**24.** This sum shall have the liquidation priority established in Neb.Rev.Stat. § 67–340(b)(II).·

**25.** However, if the assets of WLC are insufficient to pay this sum, Harry has no personal liability for such sum. The partnership agreement ex-

pressly provides that a partner shall have no personal liability for salaries due other partners, "but the payment of salaries shall be an obligation of the partnership only to the extent that there are partnership assets available for them, and shall not be an obligation of the partners individually." (Ex. 30 ¶ 10.1.) Neb.Rev.Stat. § 67–318(a) expressly makes the obligations of one partner to another to contribute if the assets are insufficient "subject to any agreement between them."

partner shall require written approval of the other partner and shall be segregated in a loan payable account." (Ex. 30 ¶ 5.4.) There is simply no evidence that Harry gave "written approval" that these advances should bear interest, and, accordingly, Joe is not entitled to interest.[26]

#### (e)

The sum of $12,432 constitutes a liability of WLC to Joe for management fees.

### 3. Are cash advances by Joe and Harry liabilities of WLC, and, if so, how are excess advances dealt with?

It is undisputed that over the years both Harry and Joe made substantial cash advances to WLC to enable it to operate. Joe contends that in the end he advanced a disproportionate amount of cash in comparison to the partners' 80/20 equity split. Joe claims that he is entitled to the excess advances with interest. Harry claims that both partners' advances are liabilities of WLC, that Harry, rather than Joe, made excess contributions, and that none of the contributions draw interest.

I find and conclude that: (a) Joe advanced more cash to WLC than his share of the partnership required; (b) Harry advanced less cash than his share of the partnership required; (c) the cash advances to WLC by both Harry and Joe constitute liabilities of the partnership; (d) Joe's excess contribution may conceivably be a personal liability of Harry's if the assets of WLC are not sufficient to pay Joe for these advances; and (e) such advances do not draw interest.

#### (a)

Nebraska law provides in pertinent part that: "Each partner shall be repaid his contributions, whether by way of capital or advances to the partnership property ... and [each partner] must contribute toward the losses, whether of capital or otherwise, sustained by the partnership according to his share in the profits." Neb.Rev.Stat. § 67-318(a) (Reissue 1990). Nebraska law further provides that as to debts of the partnership owing to partners (and others), including capital and similar advances, (Neb.Rev.Stat. § 67-340(b)(II-IV)),[27] if the partnership assets are not sufficient to repay a partner, the "partners shall contribute, as provided in paragraph (a) of section 67-318 the amount necessary to satisfy the liabilities...." Neb. Rev.Stat. § 67-340(d). In addition, "[a]ny partner ... shall have the right to enforce the contributions specified in clause (d) ... to the extent of the amount which he has paid in excess of his share of the liability." *Id.* § 67-340(f). The partnership agreement in this case contains no contrary provisions. (Ex. 30.)

█ In plain words, upon dissolution Nebraska law provides that: (a) each partner is entitled to be paid the amount of capital or advances paid into the partnership and these payments constitute liabilities of the partnership; and (b) partners must pay into the partnership any amount necessary to repay prior advances (whether or not characterized as capital) by other partners to the partnership in excess of their equity interests *if* the assets of the partnership are not sufficient to repay the partners who paid more than was required by their equity interests.

█ According to Ferdig's 1992 trial balance, (Exs. 29, 189), which all parties essentially adopt for purposes of their posttrial briefs (*compare* Harry's Proposed Findings of Fact and Conclusions of Law (Attached balance sheet dealing with "Loan Accounts" and notes 11, 12) *with* Joe's Proposed Findings of Fact and Conclusions of Law (Findings of fact ¶¶ 9, 17)). Joe paid in $115,743.50 more than he took out of his account with WLC, and Harry paid in $253,851.82 more than he took out of his account with WLC.[28] It must be remembered that these

---

**26.** This specific provision of the partnership agreement "trumps" Neb.Rev.Stat. § 45-104 (Reissue 1988) (interest on accounts) in that the statute is by its terms not applicable where it is "otherwise agreed."

**27.** Nebraska law also provides that the partnership shall indemnify "every partner in respect of

payments made ... by him in the ordinary and proper conduct of its business, or for the preservation of its business or property." Neb.Rev. Stat. § 67-318(b).

**28.** Joe suggests that a portion of these "loans" in reality belong to the trust. While the trust may indeed have an equitable interest at the time of

numbers are through December 31, 1992 only.

Joe claims, and Harry concedes in his posttrial materials, that Joe paid in $12,000 [29] in 1993, and that Joe also paid in (in error) $11,873.64 from the 1985 sale of soybeans in which WLC had no interest. *Compare* Harry's Proposed Findings of Fact and Conclusions of Law (Attached balance sheet dealing with "Beans" and "Loan Accounts" and notes 11, 12) *with* Joe's Proposed Findings of Fact and Conclusions of Law (Findings of fact ¶ 9). Adding the 1992 trial balance number of $115,743.50 to the 1993 advance of $12,000 and the soybean payment of $11,873.64 establishes a liability to Joe payable by WLC in the sum of $139,617.14.[30]

Harry claims, and Joe concedes in his posttrial materials, that in 1993 (during his takeover of the management of WLC) Harry paid cash to pay the current portion of the Field note ($9,371.28), past-due real estate taxes ($26,090.85) [31] and 1993 operating expenses ($38,510.70), resulting in a total payment of $73,972.83 for 1993. *Compare* Joe's Proposed Findings of Fact and Conclusions of Law (Findings of Fact ¶ 9) *with* Harry's Proposed Findings of Fact and Conclusions of Law (Attached balance sheet dealing with "Loan Accounts" and notes 11, 12). Adding the 1992 Ferdig trial balance figure of $253,-851.82 to the 1993 advances of $73,972.83 establishes a liability to Harry payable by WLC in the sum of $327,824.65.[32]

It is evident from the foregoing that Joe has paid more to the partnership than his share of the profits required, and Harry has paid in less than his share of the profits required. The total advances to the partnership by Joe and Harry were $467,441.79— $139,617.14 contributed by Joe plus $327,-824.65 contributed by Harry. If Harry had made advances consistent with his 80–percent interest, he would have paid in $373,-953.43 (80% of $467,441.79), and Joe would have paid in $93,488.36 (20% of 467,441.79). Since Joe contributed $139,617.14, he made excess contributions of $46,128.78 ($139,-617.14 − $93,488.36 = $46,128.78).[33] Accordingly, Harry will be ordered to pay into WLC such sums as are necessary to reduce Joe's excess advances to zero, up to a maximum of $46,128.78 (depending upon the deficiency) if the assets of WLC are not sufficient to repay Joe $139,617.14.[34]

**(b)**

Harry seems to argue that he cannot be required to pay into WLC amounts necessary to reimburse Joe for his excess contributions even if the assets of WLC are insufficient to satisfy Joe's excess payment. To the

repayment of all or a part of these advances, that issue is between the trust and Harry. As noted earlier, the account was at all times maintained in Harry's "individual" name by Ferdig and apparently recognized as such by Harry and Joe (not to mention the Internal Revenue Service).

29. Harry does argue, however, that all or part of this 1993 payment came from funds taken from the partnership in 1992 and therefore should not be credited to Joe. (Posttrial brief of Harry at 8–9.) I disagree. Monies which Joe received in 1992 have been charged to Joe in the Ferdig trial balance; thus, when Joe paid in $12,000 in 1993 his account had already been charged with receipt of the $12,000. Second, to the extent that Harry also complains that Joe took out $9,000 in management fees in 1993, as noted earlier, I have reduced Joe's claim for management fees by that amount.

30. It should be noted that Ferdig's effort to extend the 1992 trial balance into 1993 (Ex. 194) does not recognize the 1985 soybean payment. But both parties agree that this is an advance that was made and must be accounted for.

31. Joe actually believed that Harry paid a few dollars ($2.17) more on the real estate taxes than Harry claimed.

32. It should be noted that Ferdig's effort, (Ex. 194), to extend the 1992 trial balance into 1993 recognizes $63,000.00 of advances by Harry in 1993 whereas the correct number, according to both Joe and Harry, is $73,972.83.

33. Stated differently, since Harry paid $327,-824.65, but should have paid $373,953.43 (80% of the total $467,441.79), his payments were $46,128.78 less than his 80–percent equity share ($373,953.43 − $327,824.65 = $46,128.78).

34. As later discussed in somewhat more detail, while Harry will be ordered to make these payments, no personal judgment for these payments would be appropriate at this time because a deficiency cannot now be assumed, and even if one were assumed, the deficiency could not be calculated with precision until the winding-up process is at or near completion.

extent Harry seriously advances this argument, he is wrong.

First, as previously noted, Nebraska law clearly provides that a partner "must *contribute* toward the losses, *whether of capital or otherwise*, sustained by the partnership according to his share in the profits." Neb. Rev.Stat. § 67–318(a) (emphasis added). Nebraska law further provides that "[a]ny partner ... shall have the right to enforce ... contributions ... to the extent of the amount which he has paid in excess of his share of the liability." *Id.* § 67–340(f).

Indeed, it is not uncommon for Nebraska courts to enter personal judgments for indemnification of one partner by another for excess contributions. *Barthuly*, 192 Neb. at 614; 223 N.W.2d at 432 (remanding an accounting action between partners for entry of judgment in favor of one partner and against the other after adjusting the capital accounts of the partners.)

Second, the partnership agreement in this case explicitly contemplates that partners will indemnify each other regarding excess contributions. The agreement provides that: "In the event that a partner shall become liable upon an obligation or obligations of the partnership, including encumbrances, in excess of his pro rata share, the other partner shall hold said partner harmless to the extent of said excess." (Ex. 30 ¶ 8.2.) Since Nebraska law explicitly makes advances to a partnership, including capital, "obligations" of the partnership and Nebraska law further requires each partner to "contribute" toward the payment of excess payments by partners, the partnership agreement compels Harry to hold Joe harmless if the assets of WLC will not make up the deficiency.

#### (c)

 With one exception, both parties now seem to agree in their posttrial materials, *compare* Joe's Proposed Findings of Fact

and Conclusions of Law (Findings of fact ¶ 10) *with* Harry's Proposed Findings of Fact and Conclusions of Law (Conclusions of law ¶ 8), that the partnership agreement in this case explicitly prohibited the payment of interest on these partner accounts. In any event, I so find and conclude.

The agreement states, "No interest shall be payable on the capital contributions of the partners." (Ex. 30 ¶ 5.4.) Regardless of whether the contributions are "capital," the agreement further states, "Loans and interest bearing advances by a partner shall require written approval of the other partner and shall be segregated in a loan payable account." [35] (*Id.*)

Joe asserts that on one occasion there was a loan by him to WLC that was to bear interest, that California counsel was asked to draw the pertinent note by both Harry and Joe, that such a note was drawn, that Joe signed the note and forwarded it to his father for signature, and now the note is lost. Harry, of course, denies any such thing but is essentially unable to contradict Joe.[36]

The evidence supports much of Joe's claim. Joe testified without contradiction that he and Harry called the San Francisco law firm that had long represented Harry and directed the firm to prepare the note. There is evidence that Joe sold land he owned and paid or caused to be paid the sale proceeds to or for the benefit of WLC (Exs. 157, 158, 196). Counsel's transmittal letter to Joe (but not Harry) unquestionably proves Joe's claim that the San Francisco law firm prepared the note, and sent it to Joe for signature "by your father and you" on "behalf of Walker Land & Cattle." (Ex. 157.) The evidence would suggest that the principal balance of the note was about $177,579.41. (*Id.*) While there is no independent evidence of the interest rate, Joe testified that the note was to bear interest at 12 percent (during a time of very high rates).

---

**35.** There is no question that Ferdig segregated partner advances in separate accounts, although he did not show interest accruals.

**36.** This is a good example of why Harry's credibility is suspect. As discussed more fully in the text, the evidence is virtually undisputed that Harry's long-time law firm prepared the note for

this transaction and sent a letter to Joe setting forth how to calculate the principal balance of the note. (Ex. 157.) While Harry is correct, as discussed more fully in the text, that WLC cannot be held to this note, his apparent lack of candor in disputing what are essentially undisputed facts is troubling.

Joe's testimony would further support his claim that he received and signed the note. The evidence, in the form of Joe's testimony, is that he sent the note to his father for signature. It is at this point that I reluctantly find and conclude that Joe has failed in his burden of proof.

There is virtually no evidence to prove that Harry ever signed the note. Since the partnership agreement requires "written approval of the other partner," even if the note was signed by Joe, proof of Harry's signature is critical to enforcement of the note.

In lost-note cases, the party seeking to enforce the lost note must prove that "the person was in possession of the instrument and entitled to enforce it when loss of possession occurred." Neb.Rev.Stat. UCC § 3–309(a) (Reissue 1992). Joe simply cannot prove he was entitled to enforce the note when he lost possession of it because he cannot establish that Harry signed the note and the partnership agreement explicitly requires such proof. *See Castellano v. Bitkower*, 216 Neb. 806, 809–10, 346 N.W.2d 249, 252 (1984) (under predecessor to section 3–309 the court held that one seeking enforcement of a lost promissory note must establish the right to recovery by clear and convincing evidence).

I therefore find and conclude that Joe is not entitled to interest on the lost note.

**(d)**

In summary, WLC is indebted to Harry for advances made to the partnership in the sum of $327,824.65, and WLC is indebted to Joe in the sum of $139,617.14 for advances to the partnership.[37] Harry is ordered to pay into WLC such sums as are necessary to reduce Joe's excess advances to zero, up to a maximum of $46,128.78 (depending upon the

deficiency), if the assets of WLC are not sufficient to repay Joe $139,617.14.

**4. Are Ferdig's accounting fees a liability of WLC?**

Both sides agree that at least a portion of Ferdig's $5,000 fee is properly a liability of WLC. Joe contends the entire fee is a liability of WLC, while Harry contends only $2,500 is properly a liability of WLC. I find and conclude that the entire fee, estimated not to exceed $5,000 as of the date of trial, is a liability of WLC. It would not have been possible to resolve this suit, from the perspective of either Joe or Harry, without Ferdig's work preparing for trial and his testimony during trial. Indeed, both parties rely heavily upon much of Ferdig's work in their briefs. In this regard, I note that Ferdig was available to and did consult with both parties during preparations for trial. Thus, Ferdig's entire fee is properly attributable to WLC as a liability.

**D. What is the proper balance sheet of WLC on the dissolution date (trial date)?**

From and subject to the foregoing, the following balance sheet is derived as the proper balance sheet of WLC as of the date of dissolution, which is the trial date:

*Assets of WLC*

1. Cash on hand or in banks or held by others:
 a. Chambers, NE, Bank: $1,000.00
 b. Bank of America, Reno, NV: $3,000.00
 c. 1993 grain sales to Cargill and held by Cargill: $38,000.00
 d. 1993 Farm Program Payment (held by government): $12,000.00
2. Real Estate Contract Receivables:

---

**37.** It is impossible to know, and Ferdig could not state, whether these sums are properly considered capital, loans, or something else. These sums were, however, "booked" under headings entitled "accounts with Dr. Walker" and "accounts with Harry Walker," as contrasted with "Capital" accounts which were kept separately. (*E.g.*, Ex. 26, 11. 200, 210, 300, 305.) For present purposes, questions about whether these "accounts with" Harry and Joe are capital, loans, or something else are irrelevant so long as both partners are treated the same for purposes of liquidating these sums, that is, with the same liquidation priority. Since both parties treat these sums as loans in their posttrial submissions, *compare* Joe's Proposed Findings of Fact and Conclusions of Law (Findings of fact ¶ 9) *with* Posttrial Br. of Harry at 13–14, and since third-party creditors are not impacted by that characterization, I shall treat these sums as loans and give them a liquidation priority in accordance with Neb.Rev.Stat. § 67–340(b)(II).

a. H. Fritz contract: $22,399.97

b. M. Fritz contract: $5,599.93

c. S. Garber contract: $5,242.24

d. Norris Trust contract: $4,888.96

3. El Rio loan: $212,042.20 (principal only)

4. HW Ranches loan: $2,500.00

5. Approximately 640 acres of real property in Wheeler County, NE, and improvements: $400,000.00

6. An old quarter horse in the possession of Harry: $1.00

7. As-yet-unrealized income from 1994 farming season: amount unknown

*Liabilities of WLC*

1. Unpaid real estate taxes:

 a. 1992: $3,532.68

 b. 1993: $3,180.15

 c. 1994: Amount unknown

2. Balance of the Field note: $167,200.00 to $202,000.00

3. Walker Vineyards loan: $41,377.50

4. California Associates loan: $93,700.00

5. Sloan note: $4,800.00

6. As-yet-unrealized expenses of 1994 farming season, including costs of the receiver: amount unknown

7. Unpaid management fees to Joe: $12,432.00

8. Loan balances due partners: $467,441.79 [38]

 a. Harry: $327,824.65

 b. Joe: $139,617.14

9. Ferdig's fees as of date of trial: Not to exceed $5,000.00

I declare the foregoing to be the accounting to which the parties are entitled pursuant to Neb.Rev.Stat. § 67–343 (Reissue 1990), subject to the rights of the parties to such further accounting as is necessary as a result of the winding-up process.

## V. How should WLC be wound up?

There are a number of issues that must be resolved at this time regarding the mechanics of winding up the business of WLC.

 First, it is apparent that neither Harry or Joe ought to be allowed to wind up WLC. Emotions run too high on both sides. It is customary in Nebraska to appoint a receiver in cases such as this. *See, e.g., Veith v. Ress,* 60 Neb. 52, 54, 82 N.W. 116, 117 (1900) (A receiver for a partnership may be appointed in cases of insolvency, dissension, probability of waste, or when dissolution is necessary); Neb.Rev.Stat. § 25–1081 (Reissue 1989) (A receiver may be appointed "to dispose of the property according to the decree or judgment.").[39] Since a receiver has heretofore been appointed in this case, (Filing 72), I shall also appoint him to serve as receiver to wind up the affairs of WLC. It would appear that a bond of $500,000 will be sufficient. *See* Neb.Rev.Stat. § 25–1084 (Reissue 1989).

Second, pursuant to Neb.Rev.Stat. § 25–1087 (Reissue 1989), the receiver in this case will be ordered:

(a) to give a court-approved bond in the sum of $500,000 in accordance with Neb.Rev. Stat. § 25–1084 (Reissue 1989) before exercising the powers herein provided;

(b) to exercise the powers (and be subject to the limitations) set forth in the court's original order of appointment dated April 28, 1994, (Filing 72), which are not inconsistent with the powers and limitations hereinafter provided;

(c) to collect the assets of WLC;

(d) to wind up the affairs of WLC by liquidation, pursuant to Neb.Rev.Stat. § 67–301 *et seq.* (Reissue 1990), and in that connection, to have all powers necessary to accomplish such liquidation, but the receiver shall not sell or encumber WLC real or personal property without court approval, except that an asset may be sold or encum-

---

**38.** It also appears that both Harry and Joe overdrew their capital accounts. (Ex. 29, 11. 300, 305.) The capital accounts are different than the "accounts with" partners. (*Id.,* 11. 200, 210.) Neither party makes a claim regarding the negative balances of the other party's capital accounts (apparently because the negative balances are roughly in proportion to their equity interests).

**39.** The court also has authority to appoint a receiver under the provisions of Fed.R.Civ.P. 66. *See also* 28 U.S.C. § 959(b).

bered in the ordinary course of the business of WLC (such as by the sale of crops in the ordinary course of business);

(e) to make provision for the filing of all necessary tax returns, and to pay any required taxes but only after court approval;

(f) to settle and pay the accounts and debts of WLC pursuant to Neb.Rev.Stat. § 67–340 but only after court approval;

(g) to make such interim accounting as may be appropriate;

(h) to engage professionals such as accountants and lawyers to assist the receiver;

(i) to receive reasonable fees and reimbursement of reasonable expenses from the assets of WLC, but only after court approval;

(j) to sue and be sued in the name of WLC but only upon approval by this court;

(k) to conclude the liquidation of the assets of WLC by March 1, 1995 (the normal commencement of the farming season), if reasonably possible, and to file a final accounting by June 1, 1995, if reasonably possible, proposing the manner in which the liquidated assets should be applied to the debts of the partnership in accordance with Neb.Rev.Stat. § 67–340 and the terms of this opinion and subsequent opinions of courts of competent jurisdiction;

(*l*) to incur no liability on behalf of WLC without court approval, except that the receiver may incur liabilities on behalf of WLC in the ordinary course of winding up WLC if said liabilities do not exceed in the aggregate the sum of $5,000 and each creditor agrees in writing that the liability shall be paid only from the available assets, if any, of WLC in accordance with Neb.Rev.Stat. § 67–340;

(m) to exercise such further and other powers as are not inconsistent with the law, and the opinions and orders of this court.

Third, it is appropriate to anticipate some special difficulties that may confront the receiver in the winding up process. I turn to those special problems.

It is likely that certain assets of WLC and certain liabilities of WLC involving related entities may require special measures by the receiver. For example, certain debts due

WLC (such as the El Rio debt) may not be efficiently reduced to cash. If the receiver in good faith comes to this conclusion, the receiver may wish to consider refraining from endeavoring to liquidate the debt to WLC, and instead propose in the final accounting that the asset be distributed in kind (without recourse) in accordance with Neb.Rev.Stat. § 67–340.

Moreover, certain liabilities owed to related entities by WLC (such as the Walker Vineyards debt) may have certain defenses or otherwise be sufficiently doubtful that no effort to pay those creditors should be made. If the receiver in good faith comes to this conclusion, consideration should be given to distributing the liability in kind to the partners of WLC in accordance with their share in WLC (but without recourse). *See* Neb. Rev.Stat. § 67–336 (Reissue 1990).

Next, the receiver will have to deal with the interest of the Elizabeth L. Walker Trust in Harry's equity in the partnership. Neb. Rev.Stat. § 67–327(2) (Reissue 1990) provides that in "case of dissolution of the partnership, the assignee is entitled to receive his assignor's interest...." Since the interest of the trust is apparently undivided, and since Harry is an income beneficiary of the trust, distributions to Harry may need to be jointly payable to Harry and the trust "as their interests may appear."

Finally, the receiver will have to deal with a variety of obligations each partner owes to WLC. For example, Joe must convey to WLC the 40–acre (more or less) tract of land. Harry may have to contribute money to WLC to satisfy Joe's excess contributions (if the assets of WLC are not sufficient to satisfy Joe). Both partners may need to contribute additional monies to WLC if the assets are not sufficient to pay third party creditors. The receiver, if a partner is not cooperative, may wish to seek further orders from this court to force the partner to comply with the lawful requirements of the receiver. *See, e.g.,* Neb.Rev.Stat. § 67–340(d). I shall, of course, retain jurisdiction over this case, and the parties, during the pendency of the receivership and winding up process.

## VI. Should the court impose Rule 11 sanctions against Harry, and, if so, what are the appropriate sanctions?

Two of the controverted issues in the pretrial conference order dealt with the question of sanctions.[40] (Filing 40). Harry was represented by counsel during the January, 1994, pretrial conference.[41]

The first issue was whether sanctions should be imposed upon Harry for his *pro se* filing of a frivolous counterclaim. (Filing 40 ¶ E(13).) The second issue was whether sanctions should be imposed upon Harry for his *pro se* filing of a frivolous or bad-faith motion for change of venue. (*Id.* ¶ E(14).) [42] I shall now discuss the background of the sanctions issue.

### A. What did Harry do?

After he removed this case from state court, Harry, appearing *pro se* (assisted by a Nevada lawyer who did not enter an appearance),[43] filed a motion for change of venue to Nevada (Filing 3) and a counterclaim (Filing 2). These pleadings were filed in August, 1993. The motion for change of venue was denied. (Filing 16.) In that order, dated August 27, 1993, Judge Thalken admonished Harry that he was subject to the local rules of practice and the Federal Rules of Civil Procedure. (*Id.*, slip op. at 2 n. 1.)

Harry subsequently retained his present Nebraska lawyers and they entered their appearance on September 9, 1993. (Filing 17.) Following the January, 1994, pretrial conference, Harry's counsel withdrew the counterclaim on March 29, 1994. (Filing 64.) The withdrawal of the counterclaim took place about a month before trial. However, essentially all discovery had been completed when the counterclaim was formally withdrawn. For example, the depositions of Harry Walker and his wife were apparently taken on or about February 10 or 11, 1994. (Ex. 198, attached Ex. A (billing statement dated March 17, 1994).)

Harry's counsel had earlier informed Joe's counsel that they would recommend to their client that the counterclaim be withdrawn. (Ex. 198a (Letters of February 3, 1994, and March 7, 1994).) [44] On March 8, 1994, counsel for Harry informed counsel for Joe that they would dismiss the counterclaim, and advised that "you do not need to do anymore [*sic*] work in connection with that issue." (Ex. 256.) The reasons for the dismissal were set forth in the March 7, 1994, correspondence, (Ex. 198a), stating in part that "there is no provision for punitive damages in a case like this in Nebraska and there is simply no practical impact on the amount of damages which Dr. Walker would hope to recover."

Counsel for Joe asked for and received specific assurances on March 11, 1994, that counsel for Harry had specific authorization to dismiss the counterclaim. (Ex. 198, attached Ex. B (letters of March 10 and 11, 1994).) So far as I can tell, this was the first time that Harry's lawyers had specific authority from Harry to dismiss the counterclaim.

---

40. There are no other pending sanctions issues, and to the extent Joe raises other issues in his brief I do not address these other issues since they were not properly raised.

41. Judge Piester ruled earlier that the Federal Rules of Civil Procedure, as they existed prior to December 1, 1993, would pertain to this case. (Filing 32.) As a consequence, Rule 11, as it existed prior to December 1, 1993, is at issue.

42. I do not understand either of the sanctions issues to pertain to Harry's present counsel. The conduct complained of took place prior to entry of their appearance. In any event, counsel's conduct was above reproach.

43. Since the lawyer did not enter an appearance, this court lacks personal jurisdiction over him.

However, the court will consider referring the evidence regarding his conduct in this case to the Nebraska Counsel on Discipline. The ethical propriety of a Nevada lawyer representing a defendant in civil litigation in federal court in Nebraska by drafting pleadings for filing in federal court when that lawyer has failed to enter an appearance of counsel is certainly suspect.

44. These lawyers filed a motion to withdraw on December 30, 1993. (Filing 33.) They gave as reasons the fact that they had been contacted by Nevada counsel to appear only as local and not lead counsel and that they had experienced continuing difficulty communicating with Harry. (Filing 35 ¶ 2.) The magistrate judge assigned to this case would not grant permission for the lawyers to withdraw because of Harry's impending deposition. (Filing 37.)

## B. Did Harry's counterclaim violate Rule 11?

For the following reasons I conclude that Harry's counterclaim, alleging as it does fraud and conversion, violated Rule 11 because there is no evidence of reasonable prefiling inquiry and there is no evidence that the allegations of fraud and conversion were well grounded in fact.

### 1. The facts

When Harry signed his counterclaim, he swore under oath to his Nevada lawyer, who notarized the counterclaim, that "I have read the foregoing Answer and Counterclaim and know the contents thereof; that same is true and correct of my own knowledge, except as to those matters therein stated upon information and belief, and as to such matters, I believe them to be true and correct." (Filing 2 at 13.)

The counterclaim was not qualified (by "information and belief" or otherwise). (*Id.* at 7–12.) The counterclaim asserts four claims for relief: fraud, wrongful conversion, breach of contract, and interference with prospective economic advantage. I concentrate on the allegations of fraud and conversion because those are the allegations Joe concentrated on at trial.

Harry made very serious charges against Joe. For example, Harry asserted that Joe sold "off all but 300 acres of the original 1,600 acre ranch, without informing" Harry, (*id.* ¶ 10(e) at 9), and that Joe "fraudulently" caused Harry to "advance expenses and related out-of-pocket costs in an amount in excess of $100,000." (*Id.* ¶ 16 at 10.)

Harry produced no evidence to support any of his specific factual allegations. There was no evidence that Joe was guilty of anything approaching fraud or conversion. Specifically, I find and conclude that there was nothing in the evidence to support *any* of the specific factual allegations of fraud or conversion. Joe, on the other hand, produced a good deal of evidence establishing that he acted properly. Joe also established that he frequently acted against his own self-interest to benefit his father.

Finding no factual basis for Harry's claims of fraud and conversion, I also find there was no evidence that Harry made any reasonable prefiling inquiry before he signed and filed the counterclaim. Although Harry was given every opportunity at trial to explain his conduct, Harry simply failed to present any meaningful evidence explaining how he came to allege the awful things he swore were true.

Harry suggested that he made efforts to obtain records from Ferdig but was unsuccessful. However, Harry's assertions are not supported by any corroborative evidence. Ferdig essentially denied Harry's claims.

Moreover, as discussed earlier, the trial evidence supports Joe's assertions that Harry was either given records to review or the records were available to him throughout the life of the partnership. For example, exhibit 18 indicates that Harry's accountant received the annual year-end trial balances from WLC's accountants for the years 1989 and 1990. According to the exhibit, these records were sent to Harry's accountant at Joe's request. In addition, Harry obviously received the yearly partnership tax returns which contained many, if not all, of the essentials about the partnership's yearly business operations. Yet Harry was not able to identify any records that he reviewed before filing the counterclaim.

### 2. The law

Prior to its amendment in December, 1993, Federal Rule of Civil Procedure 11 stated in pertinent part:

> A party who is not represented by an attorney shall sign the party's pleading. . . . The signature of . . . [a] party constitutes a certificate by the signer that the signer has read the pleading . . .; that to the best of the signer's knowledge, information, and belief *formed after reasonable inquiry it is well grounded in fact* . . ., and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. (Emphasis added.)

Neglecting to have an adequate factual basis for a signed paper constitutes a

violation of Rule 11. *See, e.g., Temple v. Wisap USA in Texas,* 152 F.R.D. 591, 600–01 (D.Neb.1993) (attorney who sued the wrong corporation violated Rule 11). The fact that a person is not represented by counsel does not absolve the person of compliance with Rule 11, although the courts customarily give *pro se* litigants the benefit of the doubt. *See, e.g., Harris v. Heinrich,* 919 F.2d 1515, 1516 (11th Cir.1990) (although Rule 11 applies to *pro se* plaintiffs, a court must take *pro se* status into account when it determines whether the filing was reasonable).

Giving Harry the benefit of the doubt in this case does not save him from a Rule 11 violation. This is not a case where Harry is at fault for misunderstanding the law, a problem that might be expected of *pro se* litigants. Rather, this case involves Harry's forceful assertion of facts he stated were true *based upon his own personal knowledge.* Since he alleged facts amounting to fraud and conversion based upon his own personal knowledge, but had no basis for such allegations, Harry clearly violated Rule 11 when he filed the counterclaim. Under the circumstances, Harry's *pro se* status does not excuse him from the consequences of his actions.

Joe has proved a Rule 11 violation by Harry. Harry violated Rule 11 when he filed the counterclaim alleging fraud and conversion because there is no evidence of reasonable prefiling inquiry and there is no evidence that the allegations of fraud and conversion were well grounded in fact.

### 3. What are appropriate sanctions?

■ The question thus becomes: what sanctions are appropriate? Rule 11 does not require the imposition of monetary sanctions. *Temple,* 152 F.R.D. at 602. In fact, the proper role of Rule 11 is not to compensate the injured party but to deter litigation abuse. *Id.* Accordingly, the least severe sanctions consistent with Rule 11 should be imposed. *Id.*

■ In arriving at appropriate sanctions courts will normally consider the cost of the Rule 11 violation, and the presence or absence of mitigating factors. *Id.* With regard to mitigating circumstances the following factors are normally considered: (a) whether the party subjectively believed he or she was correct; (b) whether the offending conduct was done in a vindictive or punishing manner; (c) whether there is a need for discipline; (d) whether the offending party has the ability to pay monetary sanctions; (e) whether there is a peculiar need for compensation; (f) the degree of frivolousness; and (g) the danger of chilling vigorous and innovative advocacy. *Id.*

■ First, I examine the cost of the offending conduct to Joe. Joe contends that Harry's misconduct cost him more than $26,000. (Ex. 198 ¶ 8.) However, I am not persuaded that Joe's costs were the result of Harry's improper counterclaim. While I do not doubt that Joe spent what he claims, two things convince me that the costs claimed are not fairly attributable to Harry's wrongdoing.

To start with, the nature of this suit would have required virtually the same discovery without the counterclaim as Joe expended with the counterclaim. After all, at bottom this case was an accounting action and Joe would have had to prepare to meet all of Harry's complaints with or without the counterclaim as Joe had the burden of proof.

Moreover, the counterclaim was withdrawn early enough to allow Joe to refrain from preparing to contest the counterclaim at trial. Thus, Joe cannot claim that the costs he incurred at trial were caused by the filing of the improper counterclaim.

In sum, while I do not doubt that the counterclaim caused Joe to expend some monies solely in defense of the counterclaim, I am persuaded that these costs were minimal. I turn then to an examination of the presence or absence of mitigating factors.

Although Harry did not have any reason for his beliefs, I am persuaded that he subjectively believed them, and this mitigates in his favor. While Harry undoubtedly filed the counterclaim to strike at his son, the withdrawal of the counterclaim neutralizes the initial vindictiveness of Harry's action. Since Harry is not a lawyer and is not likely to appear frequently before this court, there appears to be no compelling need for discipline beyond that present in any case involv-

ing a Rule 11 violation. Harry has the ability to pay monetary sanctions. While Joe is not a wealthy man, his financial position does not establish a peculiar need for monetary compensation. The counterclaim was extremely frivolous. There is no danger that sanctions (monetary or otherwise) will chill vigorous or innovative advocacy.

Taking into consideration the costs of the Rule 11 violation and the presence or absence of mitigating factors, I am persuaded, after an examination of the full range of available sanctions, that monetary sanctions in the sum of $1,000 constitute appropriate sanctions. I shall enter judgment accordingly.

### C. Did Harry's motion for change of venue violate Rule 11?

██ Joe contends that Harry's motion to change the venue of this case to Nevada violated Rule 11. Among other things, Joe argues that in May, 1993, Harry swore to the California taxing authorities that his "principal dwelling" was in California where he "actually reside[d]," (Ex. 192), and thus his August, 1993, motion to change venue to Nevada was frivolous. While I agree that Harry probably misstated the facts when he made his declaration to the California taxing authorities,[45] I do not believe the change-of-venue motion violated Rule 11.

All parties agree that Harry is and was a resident of Nevada. Accordingly, his motion to change the venue to Nevada was factually well founded (at least insofar as the question of residency is concerned). As a legal matter, the question of whether a court should change venue is an issue about which a *pro se* litigant should be judged generously since a lay person cannot be expected to understand the nuances of this type of legal question. Accordingly, I conclude that Harry did not violate Rule 11 when he filed the motion to change venue.

### VII. Should a judgment be entered at this time, and, if so, in what form?

A number of questions arise as to whether judgment should now be entered, and, if so, what the form of the judgment should be. I address these questions in turn.

First, I have concluded that judgment should be entered at this time under the provisions of Federal Rule of Civil Procedure 54(b). While the winding up of WLC is yet to take place, and while it is conceivable that further judgments may be required (such as requiring contributions from the partners), there is no just reason for delay of entry of judgment regarding the matters which are now ripe for decision. Therefore, I shall enter judgment pursuant to Rule 54(b) by separate document upon the filing of this opinion.[46]

Second, except on the issue of sanctions, it would be inappropriate to enter a judgment against the partners for money until such time as the winding up process is complete. As noted earlier, the precise monetary obligations of the partners cannot be determined until the assets are collected and liquidated and the precise amount due the creditors has been determined. Hence, I shall not enter judgment for a sum of money against a partner (except on the issue of sanctions) at this time. However, I shall order the parties to comply with the terms of this opinion, and generally to cooperate in the winding-up process (including making all required conveyances and contributions).

Third, it would appear that a monetary judgment on the sanctions ruling can and should be entered at this time. Since the monetary sanctions are not dependent upon the subsequent winding up of WLC, entry of a monetary judgment at this time would be appropriate. *Cf. Temple,* 152 F.R.D. at 607 n. 12.

██ Fourth, as to the issue of taxable court costs,[47] I believe that these costs should

---

**45.** This also serves as a good example of why Harry was not credible at trial. In essence, Harry blamed his California lawyer for his statements about his California home. Blaming others for his own inattention was habitual with Harry.

**46.** However, it is my intention to retain jurisdiction over this case, and the parties, until the winding-up process is completed.

**47.** These costs *do not* include attorney fees. No party has made a claim for attorney fees, and such fees do not appear to be authorized under Nebraska law in this type of case.

be split between the parties in proportion to their equity interests; that is, Joe should pay 20 percent of the taxable court costs and Harry should pay 80 percent. *See* Fed. R.Civ.P. 54(d)(1). I come to this conclusion because the end result of this litigation is mutually beneficial to both parties, the relative benefit each receives is proportionate to their respective equity positions, and thus there is no "prevailing party" as those words are normally understood. For purposes of taxation of costs, the partnership is merely a passive entity and any allocation of costs to the partnership would ultimately be charged to the partners according to their equity interests. Therefore, it makes no sense to impose costs on the partnership.

Fifth, as to the costs of winding up the affairs of WLC, they, too, shall be borne according to the equity split of the partners; that is, Joe shall pay 20 percent of the winding-up costs and Harry shall pay 80 percent of those costs. I shall treat the costs of winding up the partnership business as a liability of the partnership, and as such the partners are obliged to contribute to payment of those costs in accordance with their equity positions. Neb.Rev.Stat. § 67–340(d).

Accordingly,

IT IS ORDERED that pursuant to Federal Rule of Civil Procedure 54(b):

(1) Judgment is entered in favor of Harry R. Walker, II, and against Harry R. Walker, M.D. and Walker Land & Cattle Co., for dissolution of Walker Land & Cattle Co., for an accounting, and for court-ordered winding up;

(2) Specifically, judgment for an accounting (subject to the qualifications expressed in the court's opinion) as of the date of trial is entered as follows:

### Assets of WLC

1. Cash on hand or in banks or held by others:
 a. Chambers, NE, Bank: $1,000.00
 b. Bank of America, Reno, NV: $3,000.00
 c. 1993 grain sales to Cargill and held by Cargill: $38,000.00
 d. 1993 Farm Program Payment (held by government): $12,000.00
2. Real Estate Contract Receivables:
 a. H. Fritz contract: $22,399.97
 b. M. Fritz contract: $5,599.93
 c. S. Garber contract: $5,242.24
 d. Norris Trust contract: $4,888.96
3. El Rio loan: $212,042.20 (principal only)
4. HW Ranches loan: $2,500.00
5. Approximately 640 acres of real property in Wheeler County, NE, and improvements: $400,000.00
6. An old quarter horse in the possession of Harry: $1.00
7. As-yet-unrealized income from 1994 farming season: amount unknown

### Liabilities of WLC

1. Unpaid real estate taxes:
 a. 1992: $3,532.68
 b. 1993: $3,180.15
 c. 1994: Amount unknown
2. Balance of the Field note: $167,200.00 to $202,000.00
3. Walker Vineyards loan: $41,377.50
4. California Associates loan: $93,700.00
5. Sloan note: $4,800.00
6. As-yet-unrealized expenses of 1994 farming season, including costs of the receiver: amount unknown
7. Unpaid management fees to Joe: $12,432.00
8. Loan balances due partners: $467,441.79
 a. Harry: $327,824.65
 b. Joe: $139,617.14
9. Ferdig's fees as of date of trial: Not to exceed $5,000.00.

(3) Specifically, judgment is entered finding that Harry R. Walker, II, is a partner in Walker Land & Cattle Co., holding a 20–percent share of the equity, and the assets, liabilities, profits, and losses of the partnership shall be disbursed and allocated pro rata according to such equity division;

(4) Specifically, judgment is entered finding that Harry R. Walker, M.D., is a partner

in Walker Land & Cattle Co., holding an 80–percent share of the equity, subject to the undivided interest of the Elizabeth L. Walker Trust to the extent of one half of the interest of Harry R. Walker, M.D., and the assets, liabilities, profits, and losses of the partnership shall be disbursed and allocated pro rata according to such equity division;

(5) Specifically, judgment is entered finding that the Elizabeth L. Walker Trust is not and was not a partner in Walker Land & Cattle Co.;

(6) Specifically, judgment is entered finding that a receiver should be appointed to wind up the affairs of Walker Land & Cattle Co.;

(7) Specifically, judgment is entered appointing Boyd Strope, Attorney at Law, O'Neill, Nebraska, as receiver for Walker Land & Cattle Co., (WLC) and judgment is entered ordering the receiver:

(a) to give a court-approved bond in the sum of $500,000 in accordance with Neb.Rev. Stat. § 25–1084 (Reissue 1989) before exercising powers herein provided;

(b) to exercise the powers (and be subject to the limitations) set forth in the court's original order of appointment dated April 28, 1994, (Filing 72), which are not inconsistent with the powers and limitations hereinafter provided;

(c) to collect the assets of WLC;

(d) to wind up the affairs of WLC by liquidation, pursuant to Neb.Rev.Stat. § 67–301 *et seq.* (Reissue 1990), and in that connection to have all powers necessary to accomplish such liquidation, but the receiver shall not sell or encumber WLC real or personal property without court approval, except that an asset may be sold or encumbered in the ordinary course of the business of WLC (such as by the sale of crops in the ordinary course of business);

(e) to make provision for the filing of all necessary tax returns, and to pay any required taxes but only after court approval;

(f) to settle and pay the accounts and debts of WLC pursuant to Neb.Rev.Stat. § 67–340 but only after court approval;

(g) to make such interim accounting as may be appropriate;

(h) to engage professionals such as accountants and lawyers to assist the receiver;

(i) to receive reasonable fees and reimbursement of reasonable expenses from the assets of WLC, but only after court approval;

(j) to sue and be sued in the name of WLC but only upon approval by this court;

(k) to conclude the liquidation of the assets of WLC by March 1, 1995 (the normal commencement of the farming season), if reasonably possible, and to file a final accounting by June 1, 1995, if reasonably possible, proposing the manner in which the liquidated assets should be applied to the debts of the partnership in accordance with Neb.Rev.Stat. § 67–340 and the terms of this opinion and subsequent opinions of courts of competent jurisdiction;

(*l*) to incur no liability on behalf of WLC without court approval, except that the receiver may incur liabilities on behalf of WLC in the ordinary course of winding up WLC if said liabilities do not exceed in the aggregate the sum of $5,000 and each creditor agrees in writing that the liability shall be paid only from the available assets, if any, of WLC in accordance with Neb.Rev.Stat. § 67–340;

(m) to exercise such further and other powers as are not inconsistent with the law, and the opinions and orders of this court;

(8) Specifically, Harry R. Walker, II, and Harry R. Walker, M.D., are ordered to cooperate with the receiver, and to take all actions (including making contributions) required under the provisions of the Uniform Partnership Act as adopted by Nebraska, Neb.Rev.Stat. § 67–301 *et seq.* (Reissue 1990) and the opinions of this court;

(9) Specifically, judgment is entered providing that Harry R. Walker, II, is ordered to convey to Walker Land & Cattle Co. the 40 acres, more or less, of real estate currently held by him (and perhaps others) for the benefit of the partnership;

(10) Specifically, judgment is entered providing that Harry R. Walker, M.D., is ordered to pay to Walker Land & Cattle Co. such sums as are necessary to reduce the

excess advances of Harry R. Walker, II, to zero, up to a maximum of $46,128.78, if the assets of the partnership are not sufficient to repay Harry R. Walker, II, the sum of $139,-617.14;

(11) Judgment is entered against Harry R. Walker, M.D., and in favor of Harry R. Walker, II, in the sum of $1,000 as sanctions, together with postjudgment (but not pre-judgment) interest;

(12) Judgment is entered providing that 20 percent of the taxable costs and the costs of the receivership regarding winding up shall be paid by and are taxed to Harry R. Walker, II;

(13) Judgment is entered providing that 80 percent of the taxable costs and the costs of the receivership regarding winding up shall be paid by and are taxed to Harry R. Walker, M.D.;

(14) The court retains jurisdiction to enter such further and other judgments as are appropriate, and to issue all such other orders as may be appropriate.